[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

——————

No. 08-10494

——————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 19, 2011
JOHN LEY
CLERK

D. C. Docket No. 04-60001 CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

KIFAH WAEL JAYYOUSI,
a.k.a. Abu Mohamed,
ADHAM AMIN HASSOUN,

Defendants-Appellants,

JOSE PADILLA,
a.k.a. Ibrahim,
a.k.a. Abu Abdullah Al Mujahir,
a.k.a. Abu Abu Abdullah the Puerto Rican,

Defendant-Appellant,
Cross-Appellee.

——————

Appeals from the United States District Court
for the Southern District of Florida

——————

(September 19, 2011)

Before DUBINA, Chief Judge, BARKETT and PRYOR, Circuit Judges.

DUBINA, Chief Judge:

## I. BACKGROUND

A federal grand jury in the Southern District of Florida indicted Appellants Adham Hassoun, Kifah Jayyousi, and Jose Padilla (referred to individually by name or collectively as "defendants"), along with Mohammed Youssef and Kassem Daher, for offenses relating to their support for Islamist violence overseas.[1] Count 1 charged defendants with conspiring in the United States to murder, kidnap, or maim persons overseas. 18 U.S.C. § 956(a)(1).[2] Count 2 charged defendants with conspiring, in violation of 18 U.S.C. § 371, to commit the substantive 18 U.S.C. § 2339A offense of "provid[ing] material support or resources or conceal[ing] or disguis[ing] the nature, [or] source . . . of material support or resources, knowing or intending that they are to be used in preparation

---

[1] The authorities have not arrested Mohammed Youssef and Kassem Daher, and they remain fugitives.

[2] Specifically, 18 U.S.C. § 956(a)(1) provides:

Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

2

for, or in carrying out, a violation of [§ 956(a)(1), i.e., a conspiracy to murder, kidnap or maim overseas]." 18 U.S.C. § 2339A. Count 3 charged defendants with a substantive § 2339A material support offense based upon an underlying § 956(a)(1) conspiracy. The charged conduct began in October of 1993 and continued until November 1, 2001. Before trial, this court reversed the district court's order dismissing the most serious count, Count 1, for multiplicity. *United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007).

Trial commenced on April 16, 2007, and four months later, the jury returned a special verdict convicting defendants on all counts. The jury expressly found each of the three objects of the Count 1 conspiracy (the murder of persons outside the United States, the kidnapping of persons outside the United States, and the maiming of persons outside the United States) and found that Padilla's and Hassoun's offenses continued beyond October 26, 2001, but Jayyousi's offense did not. The district court denied the defendants' motions for judgment of acquittal and new trial. On Count 1, the district court sentenced Padilla to 208 months, Hassoun to 188 months, and Jayyousi to 152 months' imprisonment. On Count 2, the district court sentenced each defendant to the maximum 60 months' imprisonment. On Count 3, the district court sentenced Padilla and Hassoun to the maximum of 180 months' imprisonment and sentenced Jayyousi to the maximum

3

of 120 months' imprisonment. The district court made all sentences run concurrently and imposed a 20-year period of supervised release for each defendant. The defendants appeal, and the government cross-appeals Padilla's sentence.

## II. ISSUES

1. Whether the district court properly admitted the testimony of FBI Agent John Kavanaugh.

2. Whether there is sufficient evidence to support Padilla's convictions on all counts and Jayyousi's conviction on Count 3, the substantive material support offense.

3. Whether the district court properly admitted the expert testimony of Dr. Rohan Gunaratna.

4. Whether the district court properly admitted against Hassoun and Jayyousi portions of a television interview with Osama bin Laden.

5. Whether the district court properly denied Padilla's motion to suppress statements he made during an interview with FBI agents.

6. Whether the district court properly denied Padilla's motion to dismiss his indictment based on alleged outrageous government conduct.

7.  Whether the district court precluded Hassoun from admitting evidence of innocent intent.[3]

8.  Whether the district court properly denied Hassoun's motion for severance.

9.  Whether the district court properly applied the terrorism enhancement to defendants' sentences.

10. On cross-appeal, whether the district court erred procedurally or substantively in sentencing Padilla.

## III.  TRIAL EVIDENCE

The government's theory at trial was that the defendants formed a support cell linked to radical Islamists worldwide and conspired to send money, recruits and equipment overseas to groups that the defendants knew used violence in their efforts to establish Islamic states.  The government posited that the defendants' efforts supported an international network of radical Islamists, including al-Qaeda and other terrorist groups such as Maktab al-Khidamat ("MAK"), the precursor to al-Qaeda founded by Palestinian Abdullah Azzam, and The Islamic Group of

---

[3] Based on our review of the record, we conclude that the district court did not preclude Hassoun from presenting evidence to support his defense of innocent intent.  Hassoun presented evidence of Muslim oppression and the genuine relief efforts he undertook to assist oppressed Muslims. [Doc. 1201, p. 31–131; Doc. 1246, p. 143–176.]

Egypt founded by an Egyptian cleric, Sheikh Omar Abdel Rahman ("the Blind Sheikh"). The government claimed that each defendant performed an important, but different, role in this support cell. To support its theory, the government presented evidence of intercepted telephone calls among defendants, faxes from support groups to defendants, checks and receipts showing financial transactions by defendants, and an al-Qaeda "mujahideen identification form" that the government contended Padilla completed in July 2000, in order to attend a jihad training camp.

The defendants' primary defense was their lack of intent to support a violent form of jihad. They contended that they provided only humanitarian aid to oppressed Muslims and did not knowingly participate in a conspiracy to provide material support or resources for terrorist organizations that engaged in murder, kidnapping, or maiming in their efforts to establish Islamic states.

The government began its presentation of evidence with Jennifer Keenan, an FBI special agent, who was a legal attache in Yemen and Islamabad, Pakistan, in 2001. During this time, United States personnel obtained evidence such as photographs, letters, documents, passports, videotapes, and a blue binder from Kandahar, Afghanistan. The FBI reviewed them for any imminent threat information. The FBI examined the binder for latent fingerprints, but did not

translate any of the documents in the binder. [Doc. 1061, p. 9–54.] Tom Langston, a CIA officer, worked in Afghanistan collecting intelligence in support of military operations. He testified that an individual brought him the blue binder, telling Langston that he discovered it in an office that was formerly used by Arabs. This individual was affiliated with a tribal network that was cooperating with the United States against the Taliban. [*Id*. at 58, 67.]

Peter Carlson, Assistant Special Agent in charge of the Miami, Florida field office for the United States Department of State's Diplomatic Security Service, testified that he issued visas and passports and assisted United States citizens who traveled abroad. [*Id*. at 85.] He identified a certified copy of Padilla's passport application that he received from Washington, D.C., copies of Padilla's social security card and driver's license, and a certified copy of a passport application that Padilla made in February 2001 in Karachi, Pakistan. [*Id*. at 101; Gov't Ex. 408, 408A, 408D, 409.] Carlson also identified a photocopy of the signature page and face page of Padilla's allegedly lost 1996 passport. [*Id*.; Gov't Ex. 409A.] John Morgan, a fingerprint specialist, compared the prints from the blue binder with the FBI's print card containing Padilla's prints. [Doc. 1098, p. 22.] He identified Padilla's prints on the front and back of a "mujahideen identification form," which was in the blue binder. [*Id*. at 35.] An FBI language analyst and

7

interpreter, Nancy Khouri, translated the documents in the blue binder, 403TR–A through 403TR–E, from Arabic to English. She testified that the identification form had "Top Secret" on the bottom of it, and the applicant noted on the form that "Abu al–Fida" recommended him. [*Id*. at 148–49.] The applicant also noted that he had traveled to Egypt for study, Saudi Arabia for hajj (pilgrimage), and Yemen for jihad. [*Id*.] The applicant answered some questions in Arabic, stated that his country was the United States, and gave his date of birth as 10/18/70, which was the same as the birth date on Padilla's passport. [*Id*. at 144, 148.]

The government then presented evidence from FBI language specialists and agents identifying numerous exhibits containing translated summaries of intercepted phone calls. One language specialist testified that he reviewed verbatim transcripts of the calls and made verbatim translations. [Doc. 1099, p. 61.] When he drafted the summaries, he listened to the calls while he read the translations to ensure a proper and accurate summary. [*Id*. at 80.] FBI Agent Kent Hukill testified that Hassoun was the subject of an intelligence investigation that Hukill, along with other agents, began in May 2002. [Doc. 1110, p. 77.] The agents reviewed the audio summaries and identified the other defendants as part of the investigation. [*Id*. at 90–91.] Agent Hukill interviewed Hassoun numerous times and identified his voice on the recordings. [*Id*. at 106.] He testified that the

8

agents used verbatim transcripts of the pertinent call summaries, which numbered 700 out of 150,000 total calls. [*Id*. at 124.] He acknowledged that Padilla's voice was identified on only seven of the calls. [*Id*. at 162.]

Another government witness, Yahya Abrahim Goba, testified that he attended an al-Qaeda camp for the purpose of preparing for jihad, which he defined as military fighting. [Doc. 1383, p. 52.] When he obtained a visa from the Pakistani Consulate en route to training camp, Goba told the personnel that he was going to Afghanistan for "tourism." [*Id*. at 61.] Goba stated that an individual who wanted to attend camp had to have a known and trusted al-Qaeda contact recommend him. [*Id*. at 59.] Goba explained that the camp participants stopped at "guest houses" in Pakistan that were managed by the Taliban and used for new recruits. Guards armed with AK-47 machine guns were at the guest houses. [*Id*. at 72.] When a participant arrived at the guest house, he relinquished his passport and other personal belongings to a trustee and filled out paperwork using an alias. [*Id*. at 79–82.] Goba stated that a recruit participated in basic training at the camps, which included war tactics, topography, and instruction with firearms and explosives such as hand grenades, land mines and Molotov cocktails. [*Id*. at 98.] Goba emphasized that no humanitarian work occurred at the guest houses, and the recruits all practiced military jihad at the camp. [*Id*. at 195, 202.]

9

Other FBI language specialists testified regarding the translations of the intercepted telephone calls. [Doc. 1111.] Fady Haydar stated that in numerous calls, individuals referred to Padilla as "Ibrahim," "Abu Abdullah," or the "Spanish Brother." [*Id*. at 56.] Baria Dagher commented that Hassoun and Jayyousi were the primary participants in the intercepted calls he translated, and Joyce Kandalaft stated that she recognized the voices of Hassoun, Jayyousi, Kaseem Daher, and Mohammad Youssef on the calls, and she noted that the individuals often used nicknames. [*Id*. at 160.] The government admitted the audiotapes through FBI Agent Russell Fincher, a counter-terrorism agent who listened to numerous audio tapes and read transcripts while listening to the tapes. Agent Fincher also interviewed Padilla at the Chicago O'Hare airport on May 8, 2002. [Doc. 1100, p. 44–94.] The district court admitted the tapes and transcripts over the defendants' authentication and relevancy objections. [*Id*. at 154.]

The government also presented the testimony of two individuals who met some of the defendants at a mosque. Herbert Atwell testified that he attended a mosque in South Florida where he met Hassoun and Padilla. [Doc. 1114, p. 6–48.] Atwell stated that Hassoun would invite people in the mosque to be mujahideen fighters, but that Hassoun was not recruiting people to be terrorist fighters. [*Id*. at 25.] Atwell understood that the mujahideen fight in wars for the cause of Islam.

10

[*Id*. at 43.] Jeremy Collins testified that he met Jayyousi at a mosque in California, and after becoming friends with Jayyousi, learned that he was publishing a newsletter, "The Islam Report." [*Id*. at 49.] Collins stated that Jayyousi was particularly concerned about the Blind Sheikh, who was convicted of conspiring to blow up the World Trade Center, and solicited funds for his defense. [*Id.* at 64.]

Collins also met Mohamed Zaky at the California mosque and learned that Zaky was forming an organization called "Save Bosnia Now," which he later renamed "American Worldwide Relief" ("AWR"), and this group worked with the American Islamic Group. Collins performed several duties for AWR—he paid bills, deposited checks, purchased medicine to send to Chechnya, sent sleeping bags and shoes to Chechnya on behalf of AWR, and purchased minutes for satellite phones AWR sent to Chechnya. [*Id*. at 70–77.] Later, AWR learned that the satellite phones had been disconnected. AWR also sent hand-held walkie-talkies to Chechnya. Jayyousi was President of AWR and made the decisions about where the organization sent its aid. [*Id*. at 83, 111, 120]. Collins stated that at some point he became concerned that AWR might be involved in more than humanitarian aid to the Chechen refugees. [*Id*. at 88.] Collins began to distance himself from AWR because the organization's work "seemed to be more fighting than relief work." [Doc. 1115, p. 81.]

11

A. FBI Agent John Kavanaugh's testimony

Over the defendants' objections, the government presented the lay opinion testimony of FBI Agent John Kavanaugh, who began working on the present case in May 2002. [Doc. 1116, 1117, 1118, 1119, 1123, 1120, 1121, 1140, 1141, 1393.] Agent Kavanaugh reviewed the telephone intercepts, the summaries for the intercepts, financial records, interview summations, faxes, and other documents pertaining to the case. Based on the present investigation and his participation in over 20 terrorist-related cases, he remarked that the people who were involved in terrorism-related cases used code words in their communications. [Doc. 1116, p. 90–91.] In reviewing the intercepted calls in this case, Agent Kavanaugh noticed the use of code words such as "football" and "soccer" for jihad; "tourism" for jihad; "tourist" for mujahideen; "sneakers" for support; "going on the picnic" for travel to jihad; "married" for martyrdom; "trade" for jihad; "open up a market" for opening a group in support of jihad; open up a "branch" for starting a jihad support group; "the first area" for Afghanistan; "school over there to teach football" for a place to train in jihad; "students" for Taliban; "iron" for weapon; "joint venture" for a group of mujahideen; "full sponsorship" for income for room and board (at training camp); and "open the door" for opportunity to go to jihad. [Doc. 1116, p. 91, 141, 161; Doc. 1117, p. 21–61, 100, 105; Doc. 1118, p.

12

20–126.] Agent Kavanaugh stated that he knew the speakers were using code words because on some occasions they said they were, and at other times he could detect the speakers were using code words by the context of the conversations. [Doc. 1116, p. 90–91.] The agent mentioned that the FBI did summarize a few of the satellite calls, but they were not produced in full transcript form. [Doc. 1121, p. 19.] He testified that the satellite phones were purchased through the AWR organization.

Agent Kavanaugh testified that the defendants were also secretive in their communications. The speakers on the intercepted calls mentioned that they were not to discuss any "relief" matters over the phone [*Id*. at 99.]; that they knew the lines were always monitored [*Id*. at 105.]; and that they did not like to "name names or areas" during phone conversations. [Doc. 1141, p. 131–33.] Jayyousi mentioned in one of the intercepted calls that "all these calls are recorded." [Doc. 1141, p. 146.]

Agent Kavanaugh stated that it was not unusual for these individuals to use nicknames in their intercepted communications. In one call, Youssef referred to Hassoun by his nickname, Abu Sayyaf. [Doc. 1118, p. 20, 28–29.] In a call between Hassoun and Youssef, Hassoun stated that they were sending the "Spanish Brother"—Padilla—to Kosovo, where Youssef was participating with

Kosovar Muslims in a fight with the Serbian government. [Doc. 1118, p. 33–35.] In another call between Hassoun, Youssef, and an unidentified male, they referred to Padilla as "the Puerto Rican" because of his Puerto Rican descent. [Doc. 1118, p. 81.] Defendants also referred to Padilla by other names, such as "Ibrahim" and "Ukasha." [Doc. 1116, p. 167; Doc. 1117, p. 33; Doc. 1118, p. 35, 37, 81–82; Doc. 1119, p. 33; Doc. 1123, p. 85.]

Agent Kavanaugh testified about Hassoun, Youssef, and Padilla's plans for Padilla to travel to Kosovo. [Doc. 1118, Gov't Ex. 107TR.] They discussed Padilla's visit with the Blind Sheikh. [Doc. 1116, p. 167.] In a call between Hassoun and Youssef, Youssef mentioned his "partner," Padilla, in their discussions about travel arrangements to Afghanistan. [Doc. 1117, p. 31–33 (Youssef mentions to Hassoun that Ibrahim will be in agreement to join Youssef).] In another call between Hassoun, Padilla, and others, Padilla stated that an individual needed discipline and obedience to participate in a jihad. [Doc. 1117, p. 105; Gov't Ex. 81TR.]

The agent also mentioned several intercepted calls discussing Padilla's travel to Egypt. While Youssef was in Egypt, Hassoun discussed with another individual who attended the South Florida mosque that he was getting together some money for Padilla to travel to Egypt. [Doc. 1118, p. 75–76.] Several months

14

later Padilla traveled to Egypt, where he and Hassoun discussed Padilla's finances. [*Id*. at 95–125.] In October 1998, Hassoun conversed with Youssef, who was in Egypt, and an unidentified male, and in response to Hassoun's inquiry about the Puerto Rican, Youssef responded that Padilla was happy; he was next to him in the building. [*Id*. at 80–81; Gov't Ex. 110TR.] During this October call, Hassoun and Youssef discussed finances, particularly Padilla's monthly expenses. [*Id*. at 83.] During this same call, Hassoun referenced other people traveling from the United States to Egypt because they "have established the groundwork through Ibrahim." [*Id*. at 84.]

Furthermore, while Padilla was still in Egypt, he spoke with Hassoun about finances again and asked Hassoun to send him some money. Hassoun told Padilla that he would send him "one grand." [*Id*. at 103.] In a later call, Padilla mentioned to Hassoun that he asked a sister (it was unclear from the record exactly who Padilla asked to assist him) to tell his mother to send him an Army jacket, book bag, and sleeping bag so he would be ready when "the door opened." [*Id*. at 108–14.] Also during this time, in October 1999, Hassoun and Padilla conversed about the lack of information Padilla was receiving in Egypt. [*Id*. at 123; Gov't Ex. 116TR.] Agent Kavanaugh stated that the information to which Padilla referred regarded the occurrence of jihads. [*Id*. at 126–130.] Hassoun told Padilla

15

to prepare financially so he could be ready to move to "some area close by." [*Id*.] Later in the conversation, they discussed whether Padilla would travel to Yemen. Padilla told Hassoun that he did not know if the brothers were good or whether he needed a recommendation to connect him with the "good brothers with the right faith." [*Id*. at 134.] Agent Kavanaugh opined that he understood the good brothers to be people who shared the same view of Islam as Padilla did. [*Id*. at 135.]

In a September 2000 call between Hassoun, Youssef, and an unidentified female, Youssef mentioned that he would be over at "[O]sama's," and Padilla was expected to be there. [Doc. 1119, p. 33, 44; Gov't Ex. 403TR (English translation of Arabic mujahideen data form dated July 24, 2000).] Agent Kavanaugh understood this to be a reference to Osama bin Laden. [*Id*.] In another call, Youssef told Hassoun and another individual that he traveled to Azerbaijan, near Chechnya, and Padilla went to Al Muqbil, Yemen. [*Id*. at 87–88.] Padilla told Hassoun that he performed the jihad and met some brothers from Yemen. [Doc. 1121, p. 170–172.]

Agent Kavanaugh testified that the defendants referenced other terrorist groups and leaders in their conversations. [Doc. 1116.] Hassoun mentioned Sheikh Abu Azzam, leader of MAK. [*Id*. at 145.] In one call, Youssef mentioned

16

to Jayyousi that he and Padilla wanted to visit the Blind Sheikh (Islamic Group of Egypt). [Doc. 1116, p. 167.] Hassoun and Youssef discussed Dr. Ayman al-Zawahiri and Abu Fayez ("Mohammad Chehade"), the leader of the Global Relief Foundation. [Doc. 1118, p. 20.]

Agent Kavanaugh also testified about a fax that Hassoun received that contained two documents. [Doc. 1117, p. 78; Govt' Ex. 212FT.] One of the documents was a letter about an issue in Ogaden, Ethiopia, and the second one was a communique involving Libya. The letter mentioned the killing of 200 infidels, which referenced the number of Ethiopian soldiers who were killed by the Muslim brothers. In a call regarding the fax, Hassoun told Youssef that 56 of the brothers were "married there," which indicated that they were martyred during the fighting. [Doc. 1117, p. 73; Gov't Ex. 212FT.] Hassoun also stated that the Ethiopian army moved in with tanks and armored vehicles and the brothers launched a counterattack and drove them away. [*Id*. at 76] Hassoun mentioned that there were heavy casualties, and that the "dogs" were helping the Ethiopian Army. [*Id*.] Agent Kavanaugh opined that he understood the reference to the dogs as being a reference to the United States government. [*Id*. at 77.]

Agent Kavanaugh interpreted a call between Hassoun, Kassem Daher, and another individual, in which Hassoun stated that "they [were] playing football in

Somalia" and they needed to send "sneakers" over there. [Doc. 1117, p. 102–03 (stating that Hassoun meant jihad and support for jihad).] In a lengthy call in August 1998, Youssef called Hassoun from Egypt to inform Hassoun that the "joint venture" they had formed resulted in the loss of 70. [Doc. 1118, p. 58.] Hassoun responded that "70 got married completely." [*Id*.] Youssef then talked about the various groups he encountered in Kosovo and told Hassoun that they thought of joining brothers in another town, but by the time they wanted to join the "club," it was being shelled heavily by the enemy. [*Id*. at 64.] Hassoun asked Youssef if they had "balls and clothes and everything, sports equipment?" [*Id*. at 65.] Agent Kavanaugh opined that these words indicated weaponry. [*Id*.]

Agent Kavanaugh identified banking records associated with Hassoun. [Doc. 1117, p. 103, Gov't Ex. 600A–E.] One of the checks, dated 1/31/97, was addressed to Kassem Daher for the amount of $2,000 and the word "Somalia" was written on the reference line. The check was written five days after a phone call in which Hassoun discussed playing football in Somalia. [*Id*. at 104–05.] Agent Kavanaugh identified a cashier's check written by Hassoun for $5,000 to Mohammad Hisham Sayefedeen, part of Youssef's full name, that appeared in wiretap intercepts and Youssef's passport. [*Id*. at 137–38, Gov't Ex. 413.] The government introduced a deposit slip for $5,000 in the name of Hassoun. [*Id*. at

18

140, Gov't Ex. 600D.]  The agent identified a financial document involving a wire transfer from Hassoun to Mohammad Hisham Youssef.  [*Id*. at 141, Gov't Ex. 601.]  The government presented Hassoun's credit card statement for June/July 1998, and the agent identified the $5,242 transaction as the amount for the wire transfer reflected in government's exhibit 413.  [*Id*. at 143–44, Gov't Ex. 602.]  The agent also identified several other checks from Hassoun.  [Doc. 1141, p. 36–91.]  There were two checks from Hassoun to Global Relief Foundation—each in the amount of $2,500—with one check containing the words "tourism" and "Chechen information" on the memo line, along with a quote from the Koran.

Defendants elicited from Agent Kavanaugh the fact that Padilla was involved in very few phone calls; that Padilla did not use code words in his conversations  [Doc. 1121, p. 58–172.]; and that Hassoun and Jayyousi used similar phrases when they discussed charitable relief work.  [Doc. 1119, p. 88; Doc. 1123; Doc. 1120; Doc. 1121, Doc. 1140.]  Agent Kavanaugh acknowledged that the government did not intercept any calls between Padilla and Youssef. [Doc. 1121, p. 58–172.]  Defendants questioned Agent Kavanaugh about many calls involving the defendants' relief work to show the jury that they lacked the intent necessary to commit the charged crimes.  [Doc. 1140, p. 53.]

B.  Dr. Rohan Gunaratna's testimony

The government also presented historical background information about conflict zones and key figures in the violent Islamic movement through the testimony of Dr. Rohan Gunaratna, the head of the International Center for Political Violence and Terrorism Research in Asia. Dr. Gunaratna testified about the characteristics of the support cells upon which the violent Islamic movement relies. [Doc. 1393, p. 114–184; Doc. 1137; Doc. 1138; Doc. 1139; Doc. 1136, Doc. 1394; Doc. 1157; Doc. 1158.] Dr. Gunaratna had studied the fields of terrorism and political religious violence for about twenty-five years and had been a teaching fellow at the U.S. Military Academy and at the Fletcher School for Law and Diplomacy at the Egyptian Center for Counter Terrorism Studies. He testified that the International Center manages one of the largest terrorism databases in the world, and it creates counter-terrorism research centers in conflict zones such as Kabul, Afghanistan, and Pakistan. He explained that the International Center works with a number of governments and countries around the world to create environments that hinder terrorist support.

Dr. Gunaratna testified that he had a special focus on Islamic organizations from 1993 to 1996, particularly organizations advocating jihad. He authored ten books, one entitled "Inside Al-Qaeda," and he had been an expert witness in terrorism cases for both the prosecution and the defense. While conducting his

research into al-Qaeda, he interviewed members of Islamist radical groups, spoke to academicians, and traveled to countries where radical Islamist violence occurred, such as Pakistan and Iraq.  The district court admitted him as an expert in the area of al-Qaeda and its associated groups and in the area of international terrorism.  [Doc. 1393, p. 134.]

Dr. Gunaratna provided background information on al-Qaeda and Osama bin Laden, a Saudi who moved to Pakistan and founded al-Qaeda, an organization committed to establishing Islamic states based on Islamic law.  Islamic law is historically opposed to the political process and to democratic regimes.  [Doc. 1393, p. 135–39.]  Abdullah Azzam helped found the predecessor of al-Qaeda, and he was a key ideologue of the jihadist movement.  [*Id*.]  Abdullah Azzam consistently campaigned for the creation of Sharia-based Islamic states (states governed by strict imposition of Islamic laws), and had no problem with using force to achieve his political objectives.  When he used the word "jihad," he meant the use of violence.  [*Id*.]  Abdullah Azzam and bin Laden created MAK, an organization to recruit and assist fighters coming to Afghanistan.  In November 1989, Abdullah Azzam was killed, and bin Laden took control of MAK and created al-Qaeda to work with MAK to support different jihadist groups which

were fighting globally. Al-Qaeda had a military training camp on the Afghanistan/Pakistan border. [*Id*. at p. 144–155.]

Dr. Gunaratna testified that al-Qaeda established and managed the Advice and Reformation Committee to distribute propaganda. This committee had an office in the United Kingdom, and Khalid al-Fawwaz served as the leader. Dr. Gunaratna acknowledged that Jayyousi received a fax from this committee, informing Jayyousi that al-Fawwaz had been appointed as bin Laden's representative to operate in that region. He acknowledged that this publication, which Jayyousi received via fax, was sent to a specific group of people. [*Id*. at 158– 63.] He stated that al-Qaeda had relationships with other radical Islamist groups outside of Afghanistan, and it provided support for these like-minded groups. [*Id*. at 169–70.]

Dr. Gunaratna also provided information regarding the support cells that provide assistance to terrorist and militant organizations. He stated that the support cells provide funds, transportation, safe houses, communications, training, and recruitment. He explained that these cells operate through "front" organizations, such as community, religious, humanitarian, and educational charities. [*Id*. at 173–80.] He also testified that in his research, he learned that members of these support cells and groups use code words and double talk in their

communications by substituting key words likely to draw suspicion with more common verbiage. [*Id*. at 181.]

In reviewing the telephone intercepts in this case, Dr. Gunaratna opined that the defendants used code words in some of their communications. When they used the word "tourism," that meant armed jihad; the word "football and/or soccer" meant fighting or combat; the phrase "to be married" referred to going to paradise or martyrdom; the phrase "first area" meant Pakistan or Afghanistan; the word "screws" meant bullets; the word "eggplant" meant a rocket propelled grenade launcher; and other words denoting fruits and vegetables were used as codes for arms. [Doc. 1137, p. 11–15.] He noted that many of these words were in other transcripts that he reviewed between radical Islamist groups and their supporters. [*Id*. at 12.] His interpretation of the code words' meanings was similar to Agent Kavanaugh's testimony, except that Dr. Gunaratna opined that when the defendants used the word jihad, they meant the violent or armed jihad, whereas the agent did not specify if the word jihad meant violent or peaceful jihad.

Dr. Gunaratna testified that during a phone call, Hassoun referenced bin Laden by his nickname, "Abu Abdallah," which was known only by his supporters. [*Id*. at 27.] In a later call, Jayyousi mentioned bin Laden's mentor, Sheikh Salman, and mentioned a CNN interview with bin Laden that showed the

23

radical Islamic violence in Somalia during that time period. Both Hassoun and Jayyousi discussed a statement or "fatwa" (a religious opinion usually issued by established religious leaders but also issued by radical leaders) that threatened America. Dr. Gunaratna opined that this fatwa the defendants discussed was "very likely" the same fatwa issued by bin Laden in August 1996. [*Id*. at 52–53.] In that same call, Jayyousi mentioned Armed Islamic Group, which was one of the most violent groups and wanted to establish an Islamic state in Algeria. [*Id*. at 58.] In commenting on a statement by Hassoun that MAK can deal with "these people" by "the sword," Dr. Gunaratna testified that "these people" meant the people in the White House, and by "the sword" was a term commonly used by the MAK leader and radical Islamists. [*Id*. at 72.]

The government presented other calls in which the defendants discussed the Chechen conflict. Dr. Gunaratna explained that the Chechens were Muslims who lived in Russia and were attempting to separate from Russia. [*Id*. at 94–132.] At some point, the Arab mujahideen assisted the Chechen separatists, and Ibham Omar al Khattab—together with bin Laden and Fat'hi Shishani, leader of the International Islamic Brigade—fought with the Afghans against the Soviets. Shishani's group was violent and wanted to create Islamic states wherever Muslims lived; this group was an extension of al-Qaeda. [*Id*. at 104–06.] Dr.

24

Gunaratna testified that the foreign mujahideen fighters in Chechnya engaged in a lot of violence; killings, suicide attacks, and martyrdom were common. [*Id*. at 108.] He stated that al-Qaeda provided financial support directly to the fighters in the Chechen conflict. [*Id*. at 117.] Dr. Gunaratna also commented on calls between some of the defendants in which they discussed the success of the Chechen conflict, evidenced by the fact that the Russian flag was no longer flying over the Chechen capital of Grozny. They also discussed the provision of funds to the Chechen separatists. [*Id*. at 111–22.]

Dr. Gunaratna described the conflict in the Muslim area of Kosovo, Yugoslavia that occurred in the 1990s. [*Id*. at 143.] Foreign mujahideen assisted in this conflict, later establishing a presence in bordering Albania. Al-Qaeda provided financial and other support to these fighters in Kosovo. The Kosovar people opposed these fighters because the people perceived them as too violent. Dr. Gunaratna commented on a call in which Youssef informed Hassoun that he was in Albania, which was the launching pad for the Arab mujahideen to enter Kosovo. [*Id*. at 149.]

Dr. Gunaratna testified that al-Qaeda's most significant number of training camps was in Afghanistan, and their purpose was to train people to participate in violence. [Doc. 1139, p. 7.] "Al-Qaeda's premier facility for providing training in

the 1990's was the al-Frooq camp" near Kandahar. [*Id*. at 10.] He commented on the secrecy of the training camps and the necessity of having an individual recommend you for training, especially for American Muslims. He stated that al-Qaeda kept records on the people who attended the training camps, and the attendees had to complete a mujahideen application form. He noted that a number of these forms were discovered from various Arab safe houses and training camps. [*Id*. at 19–30.] He testified that a new recruit could not provide his real name on the identification form. [*Id*. at 31.]

The government questioned Dr. Gunaratna regarding other intercepted calls he reviewed. In one call, Hassoun identified himself with the Abu Muhjin group, and he discussed al-Ittihad al-Islami. Dr. Gunaratna stated that both of these groups are radical Islamic groups. [Doc. 1158, p. 145.] He also commented on several calls involving Jayyousi. In one call, Jayyousi referred to funds for preparations and referred to the "first area"—code for Afghanistan. [*Id*. at 146–47.] In another call, Jayyousi spoke to the Blind Sheikh and referred to Chechnya, saying that the government was an Islamic government, "but it is full of heresy." Dr. Gunaratna noted that this statement was consistent with the view of establishing an Islamic state in Chechnya. [*Id*. at 168.] Jayyousi also referred to bin Laden in another call and discussed a fundraiser to collect money to send to

26

Afghanistan. Jayyousi clarified that the brother of whom he spoke was Arab, not Afghani, which Dr. Gunaratna testified was an important distinction because the terrorist groups wanted to support primarily the Arab mujahideen. [*Id*. at 177–79.]

On cross-examination, defendants attacked Dr. Gunaratna's credibility and his qualifications as an expert. [Doc. 1139, p. 71; Doc. 1136; Doc. 1394; Doc. 1157.] They did elicit from Dr. Gunaratna that he had not listed AWR and Save Bosnia Now as cover organizations for jihad terrorist groups; however, he did list the Islamic Group of Egypt as one. [Doc. 1157, p. 96.] He acknowledged that in the intercepted calls he reviewed involving Jayyousi, he discerned no code talk. [*Id*. at 113.]

The government presented several other witnesses in its case-in-chief. A Department of Defense employee testified that he performed a personnel search on Padilla and discovered that Padilla did not serve in the military. [Doc. 1159, p. 21.] FBI Agent Russell Fincher testified that he interviewed Padilla at the Chicago O'Hare airport in 2002. [*Id*. at 90–101.] Fincher stated that Padilla acknowledged some of his travels, but was evasive regarding his overseas travel. Joyce Kandalaft, a contract linguist with the FBI, identified several documents: two checks from Hassoun to the Canadian Islamic Association, one in the amount of $8,000 for "tourism" and another in the amount of $3,000 for "tourism" and

27

"tourists"; a check from Hassoun to AWR in the amount of $5,000 "for the brothers"; a check from Hassoun to Jayyousi for $600; several checks from Hassoun to Global Relief, one in the amount of $5,000 for "Kosovo," one in the amount of $600 for "Kosovo support," one with "Chechen tourism and media" and a Koranic verse on it, and one in the amount of $2,000 for "Afghan Relief." [Doc. 1160, p. 7, Gov't Ex. 600H–R.] The government also presented a portion of a CNN videotape of an interview with Osama bin Laden. [Doc. 1137, p. 32.]

C. Defense case

The defendants presented an expert in English/Arabic interpretation and translation to challenge the government's evidence regarding the defendants' use of code words. [Doc. 1200.] He testified that many of the alleged code words had other, more innocuous meanings than indicated by the government witnesses. He stated that a mujahid is someone who fights for a cause, either religious or political, or it can mean a person who provides a service for the infirm or for refugees. [*Id*. at 71, 97.] However, he acknowledged that most of the government's translations were correct. [*Id*. at 127-28.]

An Iman, a religious leader in the Muslim community , testified that he met Hassoun at a Florida mosque. [Doc. 1201.] He testified that the mosque was very involved in charity and "alms giving," and the mosque collected money for

victimized Muslims in other countries. Hassoun asked him for permission to hold fundraisers in the mosque for projects in Bosnia, Kosovo, and Chechnya. The Iman testified that Hassoun did not recruit mujahideen fighters within the mosque. Hassoun presented the testimony of his father-in-law, who testified that he and Hassoun were joking when they spoke of belonging to Abu Muhjin. [Doc. 1203, p. 45–59.] The other defense witnesses were character witnesses, such as co-workers and people who participated in humanitarian relief efforts with some of the defendants. [Doc. 1246, 1204, 1205.]

## IV. DISCUSSION

### A. Admission of Agent Kavanaugh's testimony

Defendants challenge the district court's admission of Agent Kavanaugh's testimony under Federal Rule of Evidence 701, specifically arguing that the district court abused its discretion in allowing Agent Kavanaugh to testify regarding his interpretation of the meanings of alleged code words the defendants used in the telephone intercepts. They argue that the agent should not have been allowed to proffer his lay opinion because he was not present during all of the intercepted calls and he did not have a rationally based perception of what the individuals meant when they used the code words. We review the district court's ruling regarding the admissibility of the agent's lay testimony under Rule 701 for a

clear abuse of discretion. *See United States v. Myers*, 972 F.2d 1566, 1576–77 (11th Cir. 1992).

Rule 701 allows a lay witness to offer opinions or inferences if they are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Subsection "(a) is the familiar requirement of first-hand knowledge or observation" and the limitation in (b) is phrased in terms of requiring that the lay witness's testimony be helpful in resolving issues. *Id*. advisory committee's note. In the 2000 Amendments, Rule 701 was changed "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Id*. advisory committee's note.[4]

Agent Kavanaugh's testimony was rationally based on his perception. While investigating this case for five years, Agent Kavanaugh read thousands of wiretap summaries plus hundreds of verbatim transcripts, as well as faxes,

---

[4] Rule 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

publications, and speeches. He listened to the intercepted calls in English and Arabic.

At trial, defendants objected to Agent Kavanaugh's opinion testimony because he did not personally observe or participate in the defendants' conversations and based his testimony largely on documents admitted into evidence. We have never held that a lay witness must be a participant or observer of a conversation to provide testimony about the meaning of coded language used in the conversation. We have allowed a lay witness to base his opinion testimony on his examination of documents even when the witness was not involved in the activity about which he testified. We have held that the testimony of a financial analyst of the FBI who "simply reviewed and summarized over seven thousand financial documents," was properly admitted under Rule 701 in *United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006). The financial analyst of the FBI in *Hamaker* "added and substracted numbers from a long catalogue of . . . records, and then compared those numbers in a straightforward fashion." *Id.* The testimony was "rationally based on the perception of the witness." *Id.* at 1332 (quoting Fed. R. Evid. 701). We have also held that testimony of a lay witness in a prosecution for Medicare fraud was "based on 'first hand knowledge or observation,'" *United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984) (quoting

31

Fed. R. Evid. 701 advisory committee note), when it was "based on [the witness's] own examination of . . . store[] records," id.

Defendants rely on *United States v. Cano*, 289 F.3d 1354 (11th Cir. 2002), to support their argument, but their reliance is misplaced. In *Cano*, a cocaine trafficking and money laundering case, the government proffered Case Agent Donnelly to testify regarding the "hieroglyphics" or symbols contained in a defendant's phone book. *Id.* at 1360–61. The government did not proffer the agent as an expert. *Id.* at 1360. The agent "decipher[ed] the hieroglyphics–by correlating the ten digit telephone number of members of the conspiracy (obtained from the wiretaps) with the ten hieroglyphic symbols opposite their names in the phone book." *Id.* at 1360–61. For the first time on appeal, the defendants objected, based on Rule 701(a), to Agent Donnelly's testimony regarding his deciphering. We agreed with the defendants that the agent was prohibited from testifying about the meaning of a simple code that the jury could have deciphered easily based on evidence admitted at the trial, *id*. at 1363–64, but based on the overwhelming evidence of guilt, we concluded that the error did not affect the defendants' substantial rights. *Id.* at 1364.

In the present case, Agent Kavanaugh testified about the meanings of code words that he learned through his examination of voluminous documents during a

five-year investigation.  His testimony was  more similar to the lay testimony held admissible in *Hamaker* and *Gold* than the testimony held inadmissible in *Cano*.  Just as the testimony of the lay witnesses in *Hamaker* and *Gold* was "rationally based," Fed. R. Evid. 701(a), on their perception of business records, Agent Kavanaugh's testimony was also based on a review of documents and "rationally based on [his] perception," id.  By contrast, Agent Donnelly "merely delivered a jury argument from the witness stand  " when he drew "inferences . . . based on facts already in evidence."  *Cano*, 289 F.3d at 1363.  But Agent Kavanaugh had examined thousands of documents, many of which were not admitted into evidence.  Agent Donnelly deciphered only a simple code, but Agent Kavanaugh's  familiarity with the investigation allowed him to perceive the meaning of coded language that the jury could not have readily discerned.

We also reject the defendants'  argument that Agent Kavanaugh's testimony was not "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Fed. R. Evid. 701(b).  We have held that a lay witness may provide interpretations of code words when the meaning of these words "[is] not 'perfectly clear' without [the witness's] explanations."  *United States v. Awan*, 966 F.2d 1415, 1430–31 (11th Cir. 1992)

Agent Kavanaugh's knowledge of the investigation enabled him to draw inferences about the meanings of code words that the jury could not have readily drawn. His testimony helped the jury understand better the defendants' conversations that related to their support of international terrorism because they "would likely be unfamiliar with the complexities" of terrorist activities. *Id.* at 1430. In his testimony he linked the defendants' specific calls to checks, wire transfers, and other discrete acts of material support that put the code words into context. [Doc. 1120, p. 21.]

The defendants also contend that the district court erred in allowing Agent Kavanaugh's testimony under Rule 701(c). We disagree. In *Hamaker*, the financial analyst of the FBI testified as a lay witness even though "his expertise and the use of computer software may have made him more efficient at reviewing [the] records." 455 F.3d at 1331–32. We permitted his testimony because he "did not testify . . . based on his financial expertise, nor did he express any expert opinion." *Id.* at 1331. *See also United States v. Rollins*, 544 F.3d 820, 832–33 (7th Cir. 2008) (holding that a law enforcement agent's testimony was admissible under Rule 701(c), even though the agent had "years of experience as a law enforcement officer," because "his understanding of the[] conversations came only as a result of the particular things he perceived from monitoring intercepted calls"

34

and his testimony was based on his "perceptions derived from [that] particular case"), *cert. denied*, 130 S. Ct. 3343 (2010).

The record confirms that Agent Kavanaugh based his testimony about the meaning of the code words on his experience from this particular investigation. He limited his testimony to what he learned during this particular investigation, and he testified that he interpreted code words based on their context [Doc. 1116, p. 90, 93.] The district court explained that "it appears as if this witness's training and experience to opine on what certain things mean is the investigation of this case." [Doc. 1116, p. 41.] The district court also limited the agent's testimony to facts he learned in his investigation of the defendants. [Doc. 1119, p. 118 ("I want to make sure . . . this witness's answer . . . is based upon things that he learned in the course of this investigation. That is how he was proffered to the Court as a 701 witness.").] Therefore, we conclude that the district court did not abuse its discretion in allowing Agent Kavanaugh to testify regarding his interpretation of the defendants' use of code words in the intercepts because the government satisfied the criteria under Rule 701.

B. Sufficiency of the evidence

Padilla challenges the sufficiency of the evidence on all three counts, and Jayyousi contends that the government did not present sufficient evidence to

convict him on Count 3, the substantive 18 U.S.C. § 2339A material support offense based upon an underlying 18 U.S.C. § 956(a)(1) conspiracy. In reviewing challenges to the sufficiency of the evidence, we must accept all reasonable inferences that support the verdict and "affirm the conviction if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt." *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990) (internal quotation marks omitted). When a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . A jury is free to choose among the constructions of the evidence." *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997) (quoting *United States v. Hardy*, 895 F.2d 1331, 1334 (11th Cir. 1990)).

The record shows that the government presented evidence that the defendants formed a support cell linked to radical Islamists worldwide and conspired to send money, recruits, and equipment overseas to groups that the defendants knew used violence in their efforts to establish Islamic states. Agent Kavanaugh, who was in charge of the bulk of the investigation in this case, identified numerous conversations among the defendants discussing Padilla's

travels to countries where Muslims were victimized. The government presented Padilla's mujahideen identification form that indicated his intent to attend a jihad training camp. The government's expert testified to the secrecy of the training camps, and the requirement that a recruit, particularly an American Muslim, receive a recommendation from a reliable brother to attend the camp. He also acknowledged that al-Qaeda kept records on the recruits who attended the training camps and that the recruits did not provide their real names on the identification forms. Government witness Goba confirmed the expert's testimony regarding the secrecy of the jihad training camps, the need for someone to recommend each recruit, and the purpose of the camp, which was to train individuals in weapons and war tactics for military jihad.

The record provides sufficient evidence for a reasonable jury to find that Padilla trained with al-Qaeda and shared his conspirators' intent to support jihad violence overseas to establish Islamic states. The government presented evidence of numerous discussions between the conspirators regarding the various conflicts involving Muslims overseas. The evidence showed that Youssef, Hassoun, and Padilla began discussing attendance at al-Qaeda camps before Padilla left for Egypt in September 1998. [Doc. 1117, p. 28–35, 43–50; Gov't Ex. 58TR.] In various calls, Youssef stated that he was ready to work with the refugees in

Kosovo, and that he fought on the front lines in the Kosovar conflict. [Doc. 1117, p. 149–51; Doc. 1118, p. 35–37; Gov't Ex. 97TR, 100TR.] Hassoun expressed his desire to send another recruit to Kosovo, and Youssef suggested Padilla. [Doc. 1117, p. 150–51.] Later, Hassoun told Youssef that he would send money with Padilla. [Doc. 1118, p. 35–37.] Further, Padilla was secretive about his plans to attend the training camp, instructing Hassoun not to tell Youssef any plans over the phone. [Doc. 1117, p.117–18; Gov't Ex. 88TR.]

The record also demonstrates that the conspirators did not intend for Padilla to remain in Egypt, but instead, they planned for him to prepare to leave Egypt for jihad at the first opportunity, [Doc. 1118, p. 105; Gov't Ex. 113TR/114TR (Padilla telling Hassoun how to reach him in case the "door opens").], and planned for Padilla to travel to the Chechen jihad after he received his training. While traveling to fight in Chechnya, Youssef told Hassoun that he would soon be with bin Laden and Khattab's company, and when Hassoun asked about Padilla, Youssef stated that Padilla was traveling to the "area of [O]sama [bin Laden]." [Doc. 1119, p. 44–46, 58–59; Doc. 1158, p. 153–56, Doc. 1393, p. 58–63; Gov't Ex. 118TR, 119TR.] Another intercept further dispels Padilla's contention regarding the sufficiency of the evidence. In October 2000, Hassoun asked Youssef if he would join "Abu Abdullah, the Puerto Rican" in Afghanistan, and

Youssef responded that he had experience fighting on the front lines and did not need to hone his military skills. [Doc. 1119, p. 79–80; Gov't Ex. 124TR.] Based on the above, we conclude that there is sufficient record evidence to support Padilla's convictions on Counts 1 and 2.

Padilla and Jayyousi both challenge the sufficiency of the evidence to convict them on Count 3. In order to convict Padilla and Jayyousi under the substantive count, the government did not have to prove that Padilla and Jayyousi personally committed violent acts; rather, the government had to prove that these individuals knew that they were supporting mujahideen who engaged in murder, maiming, or kidnapping in order to establish Islamic states. The evidence supports the jury's reasonable inference that Padilla and Jayyousi knew the training camps trained recruits in weaponry and war tactics and that they shared a common purpose to support violent jihad to regain the lands that were once under Islamic control [*See*, *e.g.*, Gov't Ex. 802, *The Islam Report* where Jayyousi wrote, "May Allah help the mujahideen topple these un-Islamic and illegal puppet regimes in our Muslim lands."]. The record indicates Padilla provided himself as material support in the form of a recruit for jihad training; personal information on the mujahideen identification form matched Padilla's personal information on his passport; the government expert identified Padilla's fingerprints on the form; the

government expert testified that the use of code words is a signature trait of a terrorism support cell; Jayyousi received a fax that had bin Laden's signature on it [Gov't. Ex. 200.]; Jayyousi oversaw the purchase of satellite phones, walkie talkies and encrypted radios to send to Chechnya to aid the Muslims in their armed conflict; Jayyousi told Mohamed Shishani that the donations for the radios (to assist in communication during fighting) did not come in time to prevent the killing of mujahideen by friendly fire; and Jayyousi acknowledged in a conversation that all their calls were recorded. We conclude that this evidence, along with other evidence presented by the government, was sufficient for a reasonable jury to conclude that Jayyousi and Padilla were guilty of providing material support or resources, knowing that these would be used in preparation for carrying out a conspiracy to murder, kidnap, or maim overseas.

C. Admission of Dr. Gunaratna's testimony

Defendants argue on appeal that the district court erred in allowing Dr. Gunaratna to testify as an expert witness because his methodology was unreliable. Specifically, they claim that they were unable to verify his methods because he would not identify the interviewees upon whom he based his information due to confidentiality agreements he had signed with them. Furthermore, Dr. Gunaratna had to rely on translators during his communications with the interviewees, and

40

defendants contend that this compromised the reliability of the information he gleaned from his interviews. They also contend that he was not qualified to testify about the use and importance of code words in communications among violent jihad supporters. "We review a trial court's evidentiary rulings on the admission of expert witness testimony for abuse of discretion." *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000).

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–95, 113 S. Ct. 2786, 2796–98 (1993), the Supreme Court stated that Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert evidence. This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule

41

702.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).  In determining the admissibility of expert testimony under Rule 702, district courts must consider whether the expert can testify competently on the areas he intends to discuss, whether the expert's methodology is sufficiently reliable, and whether the expert's testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

Defendants filed a pre-trial *Daubert* motion, which the district court denied without holding a hearing.  At trial, the district court accepted Dr. Gunaratna as an expert in the areas of al-Qaeda and its associated groups and international terrorism.  During their cross-examination, defendants objected to Dr. Gunaratna's testimony because he based his opinion on confidential or classified information.  [Doc. 1136, p. 42–50.]  They also made a Sixth Amendment objection.  [*Id.*]  The government responded that the location where Dr. Gunaratna interviewed these individuals was irrelevant, and he would be breaching confidentiality agreements with governments if he revealed where he conducted the interviews and the identity of the people he interviewed.  [*Id.* at 50–54.] The government also

responded that Dr. Gunaratna based his identification of the al-Qaeda form from his viewing of similar documents, not from his interviews. [*Id*.]

The district court noted that the defendants had been able to call into question Dr. Gunaratna's credibility on cross. [*Id*. at 49.] Then, the district court sustained the objections on relevance grounds, finding that "the fact that he has maintained confidential relationships with other governments is not relevant to this case." [*Id*. at 54–55.] The defendants made no specific objection to Dr. Gunaratna's testimony about the use of code words by violent Islamists. Therefore, because the defendants did not preserve this particular challenge to Dr. Gunaratna's testimony regarding code words, we will address this challenge under the plain error doctrine. *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1185 n.8 (11th Cir. 2006) (noting that appellate court will remand on an issue not raised in the district court only if "there is (1) error, (2) that is plain, (3) that affects substantial rights, and . . . (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings"). We conclude from the record that the district court did not plainly err in allowing Dr. Gunaratna to testify regarding the use of code words by violent radical groups. Based on his specialized knowledge of Islamist radicals, Dr. Gunaratna was able to testify regarding their method of communication. Further, his testimony related to trial

evidence, helped the jury understand the unique use of certain words in the intercepted calls, and countered defendants' claim that these words did not have violent connotations.

With regard to defendants' objection to Dr. Gunaratna's qualification as an expert, we conclude that the district court did not abuse its discretion in accepting him as an expert witness. A review of the record indicates that the defendants had broad latitude in their cross-examination, and the district court acknowledged that they had been able to call into question Dr. Gunaratna's credibility during cross. Defendants challenged his undisclosed sources for his published works and thoroughly questioned him about his interviews with extremists. [Docs. 1139, 1136, 1394, 1157, 1158.] The district court properly determined that the defendants' inability to obtain the location of Dr. Gunaratna's interviews and the identities of the interviewees did not make Dr. Gunaratna's methodology unreliable. Accordingly, we conclude that the district court's admission of Dr. Gunaratna's testimony was not "manifestly erroneous. *United States v. Douglas*, 489 F.3d 1117, 1124 (11th Cir. 2007) (quoting *Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1339–40 (11th Cir. 2003)).

D. Admissibility of televised interview of Osama bin Laden

Defendants argue that the district court erred by admitting into evidence a portion of a 1997 CNN interview with Osama bin Laden. Jayyousi and Hassoun objected at trial to the video's presentation based on Rule 401, arguing relevancy. Padilla objected based on Rule 403, arguing that it was prejudicial to him because there was no evidence he watched the interview or discussed the interview with another co-defendant. The district court admitted a seven-minute portion of the bin Laden interview, stating that the jury could consider the evidence as it pertained to Jayyousi and Hassoun's states of mind, but not Padilla's. The government presented evidence of numerous calls, [*see* Gov't Ex. 84, 85, 52, 53], in which Jayyousi and Hassoun referred to bin Laden by his nickname "Abu Abdallah," which was known only to his supporters and identified him as one of the biggest backers of jihad in Afghanistan. The two also discussed the videotaped interview and an August fatwa that Dr. Gunaratna stated was "very likely" issued by bin Laden as a threat to America. [Doc. 1137, p. 23.]

We review the district court's admission of the edited portion of the videotaped interview for abuse of discretion. *See United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000). Federal Rule of Evidence 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The district

court conducted the proper balancing test and mitigated the prejudice to the defendants by instructing the jury to consider the video not for its truth, but rather as state of mind evidence against Hassoun and Jayyousi. [Doc. 1137, p. 32–34.] The district court clearly expressed to the jury that there was no indication that the defendants were connected to the 9/11 attacks. [*Id.*] Further, the district court only admitted a seven-minute portion of the twenty-four minute video, only played it once for the jury, and did not allow the government to ask any witnesses questions regarding the video's content. *Cf. United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008) (finding that if the district court erred in admitting three-minute video clip glorifying the 9/11 attacks, any error was harmless because clips were not a central part of government's case, they only lasted three minutes of five-day presentation of government's case, and clips were only played once to jury). Because "Rule 403 is an extraordinary remedy which should be used only sparingly," *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008) (internal quotation marks omitted), the excerpted portion of the video did not present a risk of unfair prejudice such that the district court committed an abuse of discretion in allowing the government to present it to the jury.

    E. Padilla's Motion to Suppress

Padilla filed a motion to suppress statements he made during his interview with FBI agents at the Chicago O'Hare International Airport in May 2002. He argued that his statements were inadmissible because the FBI agents failed to administer *Miranda*[5] warnings prior to interrogating him. The magistrate judge conducted an evidentiary hearing on the motion and issued a report and recommendation denying the motion to suppress. Padilla filed his objections with the district court, and the government filed its response. The district court fully adopted the factual findings of the magistrate judge and denied Padilla's motion. On review of the district court's disposition of the motion to suppress, we review the facts under the clearly erroneous standard and the application of the law to the facts *de novo*. *United States v. Brown*, 441 F.3d 1330, 1344 (11th Cir. 2006).

In *Miranda*, the Supreme Court established a set of enumerated warnings that officers are required to give suspects prior to custodial interrogation. *See United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). An interrogation is custodial when "under the totality of the circumstances, a reasonable man in [Padilla's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *Brown*, 441 F.3d at 1347 (internal quotation marks omitted). The test is objective, and "the reasonable person from

_____

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

47

whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). Additionally, because of the sovereign interest in securing entry points to the United States, "some degree of questioning and of delay is necessary and is to be expected at entry points." *Id.* at 1120. "Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *Id.* (internal quotation marks omitted). *See also United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982) ("Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States.").

When Padilla arrived at the airport, he passed through customs where agents discovered that he possessed $10,526 in United States currency, although his written declaration stated that he possessed only $8,000. [Doc. 500, p. 4–46.] A customs agent escorted Padilla to a conference room to talk to the FBI agents. Padilla was not in handcuffs or otherwise physically restrained. FBI Agent Fincher stated that he wanted to speak with Padilla to gain his cooperation because

the FBI believed that Padilla had information which would prevent a terrorist attack. Agent Fincher testified that he did not restrain Padilla, and Padilla was forthcoming about his background and some of his travels. After a dinner break, which lasted over an hour, Agent Fincher asked Padilla if he would continue discussing his travels and the money he had in his possession, and Padilla indicated his desire to cooperate. Agent Fincher asked Padilla why he declared $8,000 when he was carrying over $10,000, and Padilla stated that he did not know that this was against the law and that the amount of money was not a "big deal." Agent Fincher expressed skepticism about Padilla's statement that the amount of money was not a big deal. Padilla then asked to call his mother, but when Agent Fincher asked him why he wanted to call his mother, Padilla "dropped the subject." [Doc. 549, p. 4] Padilla did not ask to leave or to speak with an attorney. After Padilla stated that he was tired, the agents thanked Padilla for his cooperation and offered to take him to a hotel and pay for his stay in order to give him an opportunity to rest and continue the interview the following day, but Padilla declined because he wanted to "clear this up that day." [Doc. 549, p. 4-5] Padilla again stated that he wanted to contact his mother, and Agent Fincher testified that the agents did not tell Padilla that he could not contact his mother. [Doc. 549, p. 5] But Padilla did not make the phone call, and the interview

49

continued. [*Id.*]  They continued discussing Padilla's overseas travel, and when

Agent Fincher asked about his passport, Padilla stated that it had been stolen in a

market, but he could not remember the name of the market or the date it was

stolen.

Following another break, Agent Fincher confronted Padilla with what the

agent believed were Padilla's intentions during his travels.  He stated that he

believed Padilla had been in Afghanistan, training with and meeting al-Qaeda

officials, that these officials sent Padilla back to Pakistan, where he later departed

for another location to commit an act of terrorism, that Padilla had been delayed

and detailed in Karachi, and that Padilla then traveled from Zurich to Egypt and

eventually to Chicago, where he intended to commit or conduct surveillance for a

terrorist act.  Agent Fincher asked for Padilla's assistance to understand what was

going on, but Padilla stood up and announced that the interview was over and it

was time for him to go.  Agent Fincher told Padilla that if he did not assist the

government, he would be served with a grand jury subpoena to compel his

testimony in New York.  About an hour later, Padilla declined to assist Agent

Fincher, and the agent arrested Padilla and read him his *Miranda* rights.

We agree with the district court that the earlier portions of the interview

were not custodial in nature, but we do not agree with the district court's

conclusion that the entire interview was non-custodial in nature. Similar to *Moya*, where we held that a defendant was not in custody, Padilla "was [not] handcuffed . . . physically held or moved, or . . . accompanied by uniformed officers. Nor was he subjected to booking procedures, [or] told he was not free to leave." *Moya*, 74 F.3d at 1119. "Nothing indicates that [Padilla] ever asked to leave or to see a lawyer" before Agent Fincher's accusation that Padilla was linked to terrorist activities. *See id.* Even Agent Fincher's offer to take Padilla to a hotel for the night to allow him to rest establishes that a reasonable person under the circumstances would not have believed that he was subject to a degree of restraint comparable to arrest because he was given the opportunity to leave the interview.

After the second break, however, when Agent Fincher accused Padilla of terrorist activities, a reasonable person would have felt subjected to a degree of restraint comparable to arrest. At this point, the interrogation became custodial, and it is evident by Padilla's reaction to Agent Fincher's accusation—he stood up and announced that the interview was over. Because the interview became custodial in nature, any statements Padilla made after he was accused of participating in terrorist activities and before he received his *Miranda* warning would have been inadmissible. A review of the record reveals that Agent Fincher did not testify at trial about any statements Padilla made after he accused Padilla

51

of participating in terrorism-related activities. [Doc. 1159, p. 90–129.] Thus, no error occurred at trial, and Padilla is not entitled to relief on this claim.

The dissent contends that the questioning became accusatorial when Agent Fincher confronted Padilla about not telling the truth about the source and purpose of the money that he had failed to declare, but being accused of lying about the funds did not make the interview custodial. We have held that a suspect questioned for approximately four hours at an entry point after he had tried to retrieve a shipment of 62 kilograms of cocaine was not in custody for purposes of *Miranda* until he was formally arrested. *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001). Law enforcement agents knew about the cocaine and questioned McDowell extensively about his activities at the point of entry, and the agents accused McDowell of lying. *Id.* at 1359. But "[t]he substance of the questioning was not accusatory," and "the teachings of *Moya* suggest[ed] that McDowell was not 'in custody,'" *Id.* at 1363.

The dissent relies on several decisions, most of which do not involve interrogation at a border crossing, and its reliance on factors that support a finding of custodial interrogation in non-border cases is of limited value. We have "stress[ed] that events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the

52

country." *Moya*, 74 F.3d at 1120. The only precedential decision relied on by the dissent that involves a border crossing is *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977), where our predecessor court explained that being forced to abandon one's luggage was "itself . . . a sufficient restriction on one's freedom of action so as to trigger the giving of *Miranda* warnings before proceeding with any interrogation." *Id.* at 255. The dissent argues that Padilla was in custody because he did not have possession of his money or luggage, but Padilla's money would have been subject to forfeiture whether or not Padilla left the interview as a part of customs enforcement, [Doc. 549, p. 2 n.1] and the district court made no finding that the government had seized Padilla's luggage. The dissent also argues that Padilla was in custody for purposes of *Miranda* because, in a context that did not involve customs enforcement we explained that, "[a]n officer's asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave." *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir. 1986). But the dissent ignores that "'referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation and does not, in and of itself, focus on the person so as to require a *Miranda* warning.'" *Moya*, 74 F.3d at 1120 (quoting *United States v. Henry*, 604 F.2d 908, 920 (5th Cir. 1979)).

53

F.  Padilla's motion to dismiss his indictment

The district court denied Padilla's motion to dismiss his indictment based on alleged outrageous government conduct while he was in custody at the Naval Consolidated Brig in South Carolina due to his designation as an enemy combatant.  "[A] motion to dismiss the indictment due to outrageous government conduct involves a question of law that we review *de novo*."  *United States v. Avery*, 205 F. App'x 819, 824 (11th Cir. 2006).  We have never applied the outrageous government conduct defense and have discussed it only in dicta.  *See United States v. Ciszkowski*, 492 F.3d 1264, 1272 (11th Cir. 2007) (Carnes, J., concurring) (describing the outrageous government conduct doctrine as rooted in "speculative dicta" and noting that we have never "reversed a conviction or vacated a sentence on th[is] basis").  Several of our sister circuits have either rejected this defense completely, *see United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995), or have been sharply critical of the defense, *see e.g.*, *United States v. Tucker*, 28 F.3d 1420, 1422–27 (6th Cir. 1994) (citing separation of powers concerns and discussing the lack of authority for any argument that outrageous government conduct violates due process); *United States v. Santana*, 6 F.3d 1, 3 (1st Cir. 1993) ("Outrageous misconduct is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts.").

Although we have never acknowledged the existence of the outrageous government conduct doctrine, we note that the actionable government misconduct must relate to the defendant's underlying or charged criminal acts. "Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." *Ciszkowski*, 492 F.2d at 1270 (majority opinion) (citing *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998)).

Padilla does not allege any government intrusion into his underlying criminal conduct. Padilla does not claim that the government caused him to leave the United States to be a jihad recruit. Instead, his claim of outrageous government conduct relates to alleged mistreatment he received at the brig after the conclusion of his criminal acts and prior to the indictment on the present charges. Thus, even if we were to adopt it, the doctrine does not apply in this situation, and the district court properly concluded that Padilla was not entitled to the relief he sought in his motion for dismissal of his indictment. *See United States v. Morrison*, 449 U.S. 361, 365–66, 101 S. Ct. 665, 668–69 (1981) (stating that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been

deliberate" and that the remedy in such situations "is limited to denying the prosecution the fruits of its transgression").

G. Exclusion of Uways's statement and Padilla's statement

Hassoun contends that the district court excluded evidence that was material to his defense in violation of his constitutional rights. There are two specific pieces of evidence about which Hassoun complains. One involves a classified statement by Abdallah Ahmad al-Rimi, a.k.a. "Uways," demonstrating that an al-Qaeda facilitator, Malik, and not Hassoun, recruited Padilla to go to Afghanistan. The government required, and the district court conducted, an *ex parte* in camera review under § 4 of the Classified Information Procedures Act, 18 U.S.C. app. 3 §§ 1–16 ("CIPA"). After reviewing all the pertinent materials, the district court approved an unclassified summary of Uways's statement, which was produced as discovery before trial. [Doc. 914.] The summary stated:

> During the 2003–2004 timeframe, Uways noted that fellow facilitator Abu Mal[ik] Al-Sharabi had met Abu Abdallah Al-Amriki during the Hajj and had convinced him to come with him to Yemen in 2000, so that he could then travel to join the second jihad in Afghanistan. During this time, Uways met with Abu Abdallah on numerous occasions to get to know him, ask him why he was willing to join jihad, and vet his personality in order to determine whether he would be a satisfactory candidate to send to jihad. Uways claimed that he ultimately decided not to send Abu Abdallah to jihad. As a result, Abu Malik turned to Rashad Sa'id Al-Abi, aka Al Fida, to get Abu Abdallah to Afghanistan. Eventually, Uways saw Abu Abdallah

56

again in Qandahar and Zormat, Afghanistan, in late 2001. Uways identified a picture of U.S. citizen Jose Padilla as being Abu Abdallah Al-Amriki.

[*Id.* at 2.] Hassoun sought admission of the unclassified summary, and the district court denied the motion, finding that Uways's statement was hearsay and not admissible under Federal Rule of Evidence 807 because Hassoun did not present the court with indicia of trustworthiness pertaining to Uways's hearsay statement. [Doc. 1052, p. 2.] Hassoun also moved to compel production of Uways, but the government responded that he was not in the custody of the U.S. government. The district court denied the motion. [*Id.*]

The other specific piece of evidence that Hassoun claims was improperly excluded involves statements Padilla made to officials in a classified videotaped interview taken during Padilla's detention at the brig. During his detention, Padilla explained to the authorities that Malik had introduced him to al-Fida. After briefing and evidentiary hearings, the court concluded that Padilla's statements were not admissible under Rule 807 because they were untrustworthy due to the conditions of Padilla's detention. [Doc. 1053.] Hassoun also filed a motion to sever his trial from Padilla's based on Uways's statements, Padilla's admissions, and pervasive pretrial publicity generated by the government

regarding Padilla's alleged activities. The district court denied this motion. [Doc. 992.]

We review the district court's evidentiary rulings and its denial of a motion for severance for an abuse of discretion. *United States v. Westry*, 524 F.3d 1198, 1214 (11th Cir. 2008) (evidentiary motions); *United States v. Blankenship*, 382 F.3d 1110, 1120 (11th Cir. 2004) (denial of a motion for severance). An abuse of discretion occurs where "the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Westry*, 524 F.3d at 1214 (internal quotation marks omitted). We see no abuse of discretion in the district court rulings.

The district court properly excluded Uways's statement under Rule 807, which provides in part:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807. The residual hearsay exception applies only when "certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1279 (11th Cir. 2009) (internal quotation marks omitted). Congress intended the residual hearsay exception to be used only in exceptional circumstances. *Id*.

Exceptional circumstances are not present in this case. The district court reviewed the classified material and provided a summary of Uways's testimony for the parties to consider. The district court found that Uways's statement did not contain "equivalent circumstantial guarantees of trustworthiness" as required by Rule 807. Additionally, Uways's statement was not "more probative on the point for which [Hassoun] offered than any other evidence" that Hassoun could have procured. *Id.* As a matter of fact, Hassoun made arguments at closing that he did not recruit Padilla for the training camp. [Doc. 1208, p. 139–145.] Moreover, the government introduced Padilla's identification form which states that the person who recommended Padilla for camp entry was al-Fida. [Gov't Ex. 403.] Accordingly, we conclude that the district court did not abuse its discretion in excluding Uways's statement.

The district court also properly excluded Padilla's statements because it found that the statements were not trustworthy in part because the military interrogators themselves stated that Padilla was often untruthful. [Doc. 1053, p. 7–8.] Because the district court was in the best position to access the reliability of the evidence, we cannot say that its exclusion of the evidence was an abuse of discretion.

We also cannot say that the district court's denial of Hassoun's motion for severance was an abuse of discretion because there was no error in the district court's exclusion of the challenged evidence. Furthermore, we see no merit to Hassoun's argument that the district court should have granted his motion for severance due to the pre-trial publicity surrounding Padilla. The district court presided over a four-week jury selection and gave instructions to the jury about the pre-trial publicity. [Doc. 1269, p. 7–10; Doc. 1247; Doc. 992.] Hassoun cannot show that the joint trial "prevent[ed] the jury from making a reliable judgment about guilt or innocence" such that the district court should have granted a severance. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993). Accordingly, we conclude that Hassoun is not entitled to a reversal of his convictions on this ground.

H. Application of the terrorism enhancement

Hassoun and Jayyousi object to the district court's application of the terrorism sentencing enhancement, U.S. Sentencing Guidelines Manual § 3A1.4 (2001). Defendants rely primarily on their assertion that their benign motive in assisting the oppressed Muslims was not calculated to influence or affect the conduct of any government. They also claim that the evidence was insufficient for the district court to find that their activities were intended to displace infidel governments that opposed radical Islamist goals. The 12-level enhancement applies if the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." *Id.* § 3A1.4(a). The Guidelines, § 3A1.4 cmt. n.1, define a federal crime of terrorism by referring to 18 U.S.C. § 2332b(g)(5), which states that it is any offense that violates a specified federal statute and is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). We review the district court's interpretation and application of the Guidelines *de novo* and its underlying factual findings for clear error. *United States v. Foley*, 508 F.3d 627, 632 (11th Cir. 2007).

The district court found that the crimes charged are among the specified statutes that could give rise to a "federal crime of terrorism." [Doc. 1372, p. 6–7.] The district court noted that the version of 18 U.S.C. § 2332b(g) in effect in 2001

61

specifically identified 18 U.S.C. § 2339A as an offense supporting the terrorism enhancement. [*Id.*] The district court also found that the defendants' activities were calculated to influence, affect, or retaliate against government conduct, satisfying the other element of the enhancement. [*Id.* at 7–10.] Specifically, the district court reasoned:

> Defendants Hassoun and Jayyousi argue that any conduct that resulted in criminal liability in this case was based upon their motives to help Muslims under physical attack or to provide each other aid to Muslims in distress. The government intends that motive is unimportant in this analysis. The counts of conviction specify the nature and level of the defendants' intent and that is all the Court needs to examine in making the determination under the statute, according to government counsel. . . .

> The language of the indictment available to the jury contained the following language: It was the purpose and object of the conspiracy to advance violent jihad, including supporting and participating in armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping and maiming for the purpose of opposing existing governments, . . . .

> Given the indictment, there is within the jury verdict a finding that the defendants' actions were intended to bring about the downfall of governments that were not Islamic or not Islamic enough.

> There was also ample evidence introduced at trial that defendants Jayyousi and Hassoun wished to impose Sharia throughout the Middle East and remove governments in the process. . . . Hassoun railed against secular governments in the Middle East and pledged allegiance to individuals and organizations who sought to eliminate the secular governments or non-Islamic governments in the Middle East.

. . . .

    . . . However, in finding the defendants guilty, the jury rejected the defendants' premise that they were only providing nonviolent aid to Muslim communities. Even so-called benign motive is subject to the enhancement if the defendants, as here, intended by their acts to affect or retaliate against the conduct of the government.

[*Id.* at 7–9.]

The district court did not err in applying the terrorism sentencing enhancement. As the district court found, the crimes charged against the defendants are among the specified statutes that can give rise to a federal crime of terrorism. Thus, the first element is satisfied. The district court also found that the Guidelines's precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was. *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) ("[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered."); *United States v. Awan*, 607 F.3d 306, 316–17 (2d Cir. 2010) (finding that government only had to demonstrate that defendant's offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them). The record demonstrates that the defendants' support activities were intended to displace "infidel" governments that opposed radical Islamist goals.

Jayyousi and Hassoun spoke expressly about their desire to impose Sharia, toppling existing governments in the process. [Gov't Ex. 802 (Jayyousi's statement in *The Islam Report*: "May Allah help the mujahideen topple these un-Islamic and illegal puppet regimes in our Muslim lands."); Gov't Ex. 70 (Hassoun's statement that Muslims have a duty of jihad to regain every land that was under the umbrella of Islam).] Defendants' motive "is simply not relevant." *Awan*, 607 F.3d at 317. Thus, the second element is satisfied, and the district court properly applied the terrorism sentencing enhancement.

## I. Padilla's sentence (cross-appeal)

The government contends that the district court erred procedurally and substantively in imposing a sentence below the Guidelines range for Padilla. The district court calculated Padilla's advisory range, applying the 2001 Guidelines, and placed him at offense level 40 and criminal history category VI, corresponding to a 360 months–to–life sentence. The district court also imposed the terrorism sentencing enhancement. After hearing arguments on the 18 U.S.C. § 3553(a) factors, the district court lowered Padilla's offense level to 33, which produced a guideline range of 235–293 months' imprisonment, then selected 250 months as the possible term of imprisonment. The district court then varied downward an

additional 42 months to reflect Padilla's prior detention and imposed a 208 months sentence.

The government argues that the district court committed numerous sentencing errors: first, it improperly relied on the fact that Padilla's actions did not involve an act of terrorism directed to the United States; second, it improperly relied on the fact that the defendants did not personally kill, maim, or kidnap anyone; third, it erred by finding that a variance was necessary to avoid unwarranted sentencing disparity; fourth, it erred by finding that Padilla did not complete his al-Qaeda training; and fifth, the district court did not provide sufficient detailed explanation for why it deviated from the Guidelines range. The government also asserts that the district court committed a substantive error in imposing Padilla's sentence because it did not fully acknowledge Padilla's extensive criminal history. The government stated that Padilla was a career offender based on over 17 arrests, his participation in a murder while he was a juvenile, his offense for battery on law enforcement, and his weapons possession offense. [PSI para. 160–82.] Because the district court did not sufficiently consider Padilla's criminal record, the government posits that it substantively erred in imposing his sentence.

We review the district court's sentencing decision for reasonableness, imposing a deferential abuse of discretion standard of review. *Gall v. United States*, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). The Supreme Court created a two-step process for review to ensure that district courts do not commit either procedural or substantive errors in imposing sentences. The appellate courts "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id*. at 51, 128 S. Ct. at 597. The first step, aimed at addressing procedural errors, highlights the continued importance of the Guidelines, and the Supreme Court's intention that the "continued use of the Guidelines in an advisory fashion would further the purposes of Congress in creating the sentencing system to be honest, fair, and rational." *United States v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005). The second step concerns the substantive reasonableness of the sentence. "When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51, 128 S. Ct. at 597. If the sentence

66

imposed is outside the Guidelines range, the appellate court must determine that the district court's consideration of the 3553(a) factors justified the variance. *Id.*

The district court did not commit procedural error. Neither party contends that the district court failed to properly calculate the Guidelines range or treated the Guidelines as mandatory. The district court considered the 3553(a) factors, and we do not require "the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553 factors." *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005). Although a district court errs when it relies on clearly erroneous findings of fact and the government argues that the district court erroneously found that Padilla did not complete his al-Qaeda training, the record does not support a conclusion that this finding was clearly erroneous. Padilla's Arabic alias was listed only on the second translation of the al-Qaeda training graduation list. [Doc. 1371, p. 19.] The original translation listed a similar name that was referenced several times in the blue binder. [*Id.* at 19–20.] Furthermore, the district court adequately explained that it gave Padilla a sentence that was below the Guidelines range for several reasons: the conditions of Padilla's prior confinement, his allegedly low risk of recidivism due to his age at the time of his anticipated release, the comparable sentences

imposed on other terrorists, and the fact that Padilla did not personally injure anyone or target Americans in his conspiracy.

However, Padilla's sentence is substantively unreasonable because it does not adequately reflect his criminal history, does not adequately account for his risk of recidivism, was based partly on an impermissible comparison to sentences imposed in other terrorism cases, and was based in part on inappropriate factors. First, the district court acknowledged that Padilla had a criminal history but then unreasonably discounted this criminal history when it imposed a sentence. The presentence investigation report classified Padilla as a career offender, pursuant to U.S.S.G. § 4B1.1, because of his extensive criminal history, which included 17 arrests and a murder conviction. Congress has expressed a desire that career offenders receive sentences "of imprisonment at or near the maximum term authorized," 28 U.S.C. § 994(h), and Padilla's Guidelines sentence reflected this policy, but the district court deviated from this policy. The Guidelines are not mandatory and a district court is often free to give a below-Guidelines sentence, but the discretion of a district court to sentence a criminal is not unbounded. Padilla's sentence of 12 years below the low end of the Guidelines range reflects a clear error of judgment about the sentencing of this career offender. Hassoun had

no prior criminal history but received a sentence that is only 20 months less than Padilla's sentence.

Second, Padilla's sentence unreasonably fails "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The district court explained that given Padilla's age when he is eligible to leave the criminal system, he will unlikely engage in new criminal conduct. [Doc. 1373, p. 14.] The government argues to the contrary that "the risk of recidivism upon release is very real. That risk is greater because Padilla has literally learned to kill like a terrorist." [Gov't Br., p. 75.] We agree that the district court failed to consider the nature of Padilla's crimes and his terrorism training. Although recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. *See United States v. Irey*, 612 F.3d 1160, 1213–14 (11th Cir. 2010) (en banc), *cert. denied*, .131 S. Ct. 1813 (2011). We also reject this reasoning here. "[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). Padilla poses a heightened risk of future dangerousness due to his al-Qaeda

69

training. He is far more sophisticated than an individual convicted of an ordinary street crime.

Third, in considering "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), the district court unreasonably failed to consider the significant distinctions between Padilla's circumstances and the sentences of other offenders the district court referenced at the sentencing hearing. [Doc. 1373, p. 15–16.] In comparing Padilla to criminals like David Hicks, Yahya Goba, and Imran Mandhai who had either been convicted of less serious offenses, lacked extensive criminal histories, or had pleaded guilty, the district court erred. *See United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). The district court also improperly relied on the Terry Nichols and Zacarias Moussaoui prosecutions as examples of the types of behavior that warrant a life sentence because the government sought the death penalty in those cases. On remand, we admonish the district court to avoid imposition of a sentence inconsistent with those of similarly situated defendants. It should not draw comparisons to cases involving defendants who were convicted of less serious offenses, pleaded guilty, or who lacked extensive criminal histories, nor should it draw comparisons to cases where the government sought the imposition of the death penalty. See

70

*United States v. Abu Ali*, 528 F.3d 210, 265 (4th Cir. 2008) ("[T]o require a similar infliction of harm before imposing a similar sentence would effectively raise the bar too high. We should not require that a defendant do what . . . Nichols did in order to receive a life sentence.").

Next, the district court substantively erred in reducing Padilla's sentence based on the fact that Padilla did not personally harm anyone and his crimes did not target the United States. The jury convicted Padilla of violating a statute that prohibits any conspiracy to murder, kidnap, or maim outside the United States. We held in a pre-*Booker* case that a district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime. *United States v. Mandhai*, 375 F.3d 1243, 1249 (11th Cir. 2004). Post-*Booker*, the Fourth Circuit held that "[t]o deviate [a sentence downward] on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct." *Abu Ali*, 528 F.3d at 264 . Furthermore, the Guidelines account for the distinction between a murder offense and a conspiracy to murder offense. See U.S.S.G. § 2A1.5.

Lastly, we have held that a district court may reduce a sentence to account for the harsh conditions of pretrial confinement, *United States v. Presley*, 345 F.3d 1205 (11th Cir. 2003), but that decision does not justify a downward departure as

71

extensive as the one the district court gave Padilla. In *Presley*, we held that a district court had discretion to lower a 30 year sentence by two and one-half years when the defendant had been confined for six years prior to trial, five of which were spent in a 23 hour a day "lockdown." *Id.* at 1219. Here, the district court reduced Padilla's sentence by 110 months largely based on the harsh conditions of his prior confinement and then lowered his sentence by another 42 months to account for the time Padilla spent in pre-trial confinement, for a total of 152 months' departure. Although some downward variance is allowed in this circumstance, the district court abused its discretion when it varied Padilla's minimum Guidelines sentence downward by 42 percent, a period more than three and one-half times his period of actual pretrial confinement.[6] Accordingly, the district court substantively erred in imposing Padilla's sentence, and we vacate and remand his sentence to the district court for re-sentencing.

The dissent argues that by vacating Padilla's sentence we have usurped the authority of the trial judge, but "[l]ooking at sentencing decisions through the

---

[6] Although the government does not challenge the district court's decision to reduce Padilla's sentence by 42 months to reflect his time of pretrial confinement, we note that the Attorney General must already give Padilla credit for his time served in pretrial confinement. 18 U.S.C. § 3585(b); *United States v. Wilson*, 503 U.S. 329, 334, 112 S. Ct. 1351, 1354 (1992). On remand, we remind the district court that we "have determined that custody or official detention time is not credited toward a sentence until the convict is imprisoned." *Dawson v. Scott*, 50 F.3d 884, 888 (11th Cir. 1995).

prism of discretion is not the same thing as turning a blind eye to unreasonable ones." *Irey*, 612 F.3d at 1160. The dissent emphasizes that the district court considered all the factors it was required to consider, but the district court "commit[ted] a clear error of judgment in considering the proper factors." *Id.* at 1189. The district court attached little weight to Padilla's extensive criminal history, gave no weight to his future dangerousness, compared him to criminals who were not similarly situated, and gave unreasonable weight to the conditions of his pre-trial confinement.

## V. CONCLUSION

We have meticulously reviewed the entire record of the four-month trial in this case and conclude that the defendants are not entitled to relief on any of their claims. We do conclude, however, that the district court erred in imposing Padilla's sentence. Accordingly, we affirm the defendants' convictions in all respects but vacate Padilla's sentence and remand his case to the district court for re-sentencing consistent with this opinion.

**AFFIRMED** in part; **VACATED** and **REMANDED** in part.

BARKETT, Circuit Judge, concurring in part, and dissenting in part:

I concur in the majority's resolution of issues three, four, six, seven, eight, and nine. However, I believe the majority makes three significant errors in this case affecting issues two, five, and ten. First, Agent Kavanaugh was never qualified as an expert and should not have been permitted, as a lay witness, to give his opinion of the evidence in the case, because it was not based on firsthand knowledge and his lay opinion testimony was merely the government's closing argument in disguise. Permitting a government agent to give his lay opinion based only on the fact that he has investigated the case contravenes both the spirit and the letter of our evidentiary rules and case law. Second, in concluding that Padilla's <u>Miranda</u> rights had not been violated, the majority ignores clear record evidence that Padilla was "in custody" at the time of any incriminating statements and conduct.[1] Finally, as to Padilla's sentence, I see no principled basis on which to conclude that the district court reversibly erred in applying the 18 U.S.C. § 3553(a) factors to reach the seventeen and one-half years sentence.

I.   <u>Agent Kavanaugh's Lay Opinion Testimony Was Not Admissible Under Rule 701</u>

---

[1] Although it is possible that these two errors might be considered harmless, the government makes no substantial argument or showing that these significant errors of law are harmless in this case.

74

In our legal system, it is the jury's function to weigh the credibility of witnesses, to draw inferences from contradictory evidence, and to reach conclusions about the evidence. See e.g., Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1173 (11th Cir. 2010); Nesmith v. Alford, 318 F.2d 110, 137 (5th Cir. 1963).[2] Generally, witnesses testify to facts of which they have direct knowledge. However, witnesses may give their opinions under two circumstances: either when they have expert knowledge and are qualified under Federal Rule of Evidence 702 to render such an opinion; or when they have personally experienced an event and therefore have the ability to describe their layperson's perception of the event that the jury cannot otherwise experience for itself. Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event. It includes "the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." See Fed. R. Evid.

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions handed down by the Fifth Circuit before October 1, 1981.

701 advisory committee's note (2000 Amendments) (quoting Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995)).  Further examples include "a witness's opinion that a person with whom he had spoken was drunk, or that a car he observed was traveling in excess of a certain speed," United States v. Marshall, 173 F.3d 1312, 1315 (11th Cir. 1999), or a witness's characterization of a vessel that he personally saw in operation as a "go-fast" boat.  United States v. Tinoco, 304 F.3d 1088, 1119 (11th Cir. 2002).

To ensure that a witness's lay opinion puts "the trier of fact in possession of an accurate reproduction of [an] event" and does not "amount to little more than choosing up sides," Rule 701 permits lay opinion testimony only under certain circumstances.  See Fed. R. Evid. 701 advisory committee note (1972 Proposed Rules).  The rule provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701 (emphasis added). I agree with the majority that subpart (c)

does not apply.[3] Thus, the only question is whether Agent Kavanaugh's opinions

were "(a) rationally based on the perception of the witness, and (b) helpful to a

clear understanding of the witness's testimony or the determination of a fact in

issue." Id.

The requirement that lay opinion testimony be "rationally based on the

perception of the witness" has been explained as the "familiar requirement of

first-hand knowledge or observation." See Fed. R. Evid. 701 advisory

committee's note (1972 Proposed Rules) (emphasis added); see also Marshall, 173

F.3d at 315 (holding that under Rule 701, "the opinion of a lay witness on a matter

is admissible only if it is based on first-hand knowledge or observation"). For

example, in United States v. Mock, we held that a lay witness's opinion testimony

---

[3] It is clear that under the 2000 Amendment to Rule 701 which added subpart (c) to the rule, and this Circuit's subsequent precedent, see United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir. 2006), that law enforcement officers now cannot testify under Rule 701 should they wish to offer opinion testimony that is based on their years of law enforcement experience, but must instead be qualified as an expert under Rule 702. Even prior to Dulcio, this Circuit generally required a law enforcement officer's testimony about the modus operandi of drug smugglers and the meaning of coded language in conversations to qualify as expert and not lay opinion when derived from their years of experience. See e.g., United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (permitting DEA agent to testify as an expert about the structure of drug trafficking organizations and the use of coded language); United States v. Chastain, 198 F.3d 1338, 1348-49 (11th Cir. 1999) (holding that a federal agent who had been a pilot for twenty-one years, was a flight instructor, had spent ten years in the United States Customs Service investigating drug smuggling, and had testified six previous times as an expert on drug smuggling by plane was qualified to offer his expert opinion on general techniques of drug smugglers).

77

that she "believed" someone else set two fires was properly excluded under Rule 701 because it was <u>not</u> based on her first-hand knowledge. 523 F.3d 1299, 1303 (11th Cir. 2008). Likewise, in <u>Marshall</u>, we held that the testimony of a supervisory DEA agent about the origins of a supply of cocaine was inadmissible because the agent "was not present at any of the meetings between [the drug dealer] and the defendants" and thus he "had no personal knowledge regarding the origin of the cocaine given to him by [the drug dealer]" even though he was investigating the case. 173 F.3d at 1315. When we have permitted witnesses to give their lay opinion about an event, it is because the witnesses personally perceived the events as they occurred, drawing on their sensory and experiential observations. <u>See e.g.</u>, <u>United States v. LeCroy</u>, 441 F.3d 914, 926-27 (11th Cir. 2006) (holding that the trial court had properly admitted as lay opinion a crime scene specialist's testimony based on direct observation that a blood stain on a shirt appeared to be caused by someone "wiping a bloody knife off on the shirt"); <u>United States v. Myers</u>, 972 F.2d 1566, 1570, 1577 (11th Cir. 1992) (holding that a witness who "saw six pairs of scabbed reddish burn marks approximately two and one half inches apart," on the victim's back could give his lay opinion that the "marks on [the victim's] back were consistent with marks that would be left by a stun gun" because the witness's "conclusion was rationally based upon his

78

personal perception of [the victim's] back and his nineteen years of experience[4] on the police force").

We have rejected the argument that an officer's lay opinion as to the meaning of facts already in evidence satisfies Rule 701(a)'s personal perception requirement. In United States v. Cano, the lead detective testified that the individual hieroglyphic symbols in a phone book in evidence represented a specific numeral. 289 F.3d 1354, 1360-61 (11th Cir. 2002). He testified that based on his comparison of two of the conspirators' phone numbers to the hieroglyphic symbols, he could break the code used and figure out that each symbol represented a specific numeral. Id. We concluded that this testimony did not satisfy the requirement of Rule 701(a) that testimony be "based on the perception of the witness." Id. at 1363 (quoting Fed. R. Evid. 701(a)). We explained that the detective "did nothing more than call the jurors attention to the fact that the hieroglyphics appearing next to the names of two of the conspirators . . . represented their telephone numbers." Id. "Nothing in the inferences [the detective] drew was based on his perception; rather, the inferences were based on

---

[4] Although the officer's nineteen years of experience would no longer be a permissible basis to support his lay opinion under the 2000 Amendments to Rule 701 that preclude lay opinions that are based on "scientific, technical, or other specialized knowledge," see Dulcio, 441 F.3d at 1275, there is no dispute that the officer in Myers saw first-hand the burn marks on the victim's back and could render a lay opinion based on his personal perception of this injury.

facts already in evidence." Id.  In other words, the detective's review of the

documentary evidence could not meet the personal perception requirement of Rule

701(a).

This record categorically establishes that Agent Kavanaugh's opinions were

not based on anything he rationally perceived through "first-hand knowledge or

observation."  Agent Kavanaugh testified that his opinions were based solely on

his involvement in the case.  His assignment consisted of reviewing pre-collected

information, including phone calls, facsimiles, financial records and interviews;

conducting some additional interviews; identifying which phone calls and

facsimiles ("the intercepts") were pertinent to the investigation; and having those

both transferred to an audio cassette and transcribed.  Many of the intercepts were

in Arabic and required translation into English, which was done by someone other

than Agent Kavanaugh, who does not speak or read Arabic.

Prior to Agent Kavanaugh's testimony, each juror had been provided with

binders containing English translations of the 120 intercepts that had been

admitted into evidence through another FBI agent.  Each transcript contained the

date of the phone call, the telephone number of the incoming or outgoing phone

call or facsimile, the identity of the participants on the call, and the verbatim

transcript of each conversation.  All of the phone and facsimile intercepts were

either placed from or received at telephone numbers associated with Hassoun or Jayyousi.

After the jurors listened to an individual call that corresponded to a transcript in the binder, Agent Kavanaugh then gave his interpretation and opinion about the meaning of the defendants' conversations in that transcribed phone call. He pointed out to the jury when he believed the defendants were speaking in code and then gave his opinion of what he thought the conversation and dozens of "code words" actually meant. He not only told the jury that a particular conversation meant something other than what the conversation purported to be about, he also supplied the meaning he believed actually should be attributed to the conversation. However, other than the one or two instances in which the defendants themselves identified the meaning of a code word, Agent Kavanaugh never explained the source of the words and phrases that he claimed were the "true meaning" of the defendants' words. He merely testified that his opinions about the meaning of the "code" words came from "everything he learned in this investigation."

But Agent Kavanaugh never explained what knowledge or perception he gained during the investigation that allowed him to interpret the conversations any better than the jury. While no one disputes that Agent Kavanaugh spent a

81

significant amount of time investigating this case, there is nothing in the record, and the majority fails to identify anything therein, that identifies the specific first-hand experiences and observations from his investigation that would support his lay opinion about the meaning of evidence before the jury. The <u>only</u> specific aspect of his investigation that he identified as the basis for his opinions were the transcripts themselves, which were before the jury. Although he stated generally that he read volumes of documents and interviewed individuals, he never identified anything specific from that investigation that informed his opinions of the actual meaning of the defendants' conversations.[5]

The majority's assertion—that Agent Kavanaugh's opinions were permissible because they were based on his personal perception of the defendants' pre-recorded conversations as informed by everything he learned in his investigation—has no support in the law. When we have permitted law enforcement officers to offer their lay opinion about the meaning of conversations, we have required the opinion to be based on more than merely the officer's

---

[5] Although the jury might have determined for themselves that the defendants were trying to hide the real meaning of their conversations, Agent Kavanaugh testified for many days in great detail about many of the conversations under the authority of his status as the FBI's lead case agent on this case. More importantly, regardless of whether the jury could have reached conclusions similar to Agent Kavanaugh's, a question which would be considered in an analysis of harmless error, the legal question about the admissibility of his testimony under Rule 701 boils down to the principle that a law enforcement officer cannot testify about his view of the evidence just because he spent a lot of time investigating the case.

knowledge of the particular investigation, contrary to the majority's conclusion otherwise. A law enforcement officer's lay opinion about the meaning of a conversation is based on his or her first-hand knowledge when he or she is either (1) a personal participant in a conversation as an undercover agent, or (2) a listener to a conversation while observing a defendants' behavior in real time to coordinate the conversation with the conduct.

For example, in United States v. Awan, we upheld the admission of an undercover agent's lay opinion testimony about the meaning of terms involving high finance because the agent "was actually present and participating in the conversation and observing what was happening at the time in terms of gestures and the like of those who are speaking[.]" 966 F.2d 1415, 1430 (11th Cir. 1992). In allowing the testimony of the agent, who personally participated in the conversations, we explained that under Rule 701 "[a] witness may clarify conversations that are abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that were clear only to the defendant and the witness." Id. (citations and internal quotation marks omitted).

The majority's reliance on Awan to support the admission of Agent Kavanaugh's testimony is completely misplaced. Unlike the agent in Awan, Agent Kavanaugh was not a personal participant in either the alleged conspiracy

83

or a single conversation about which he opined, elements essential to the admissibility of the testimony in <u>Awan</u>. Not only was the agent in <u>Awan</u> an active participant in the conversations involving the high finance terms he testified about, but he had been undercover for two years posing as a financial consultant and had actually participated with Colombian drug dealers in a highly complex money laundering scheme involving sophisticated banking transactions. <u>Id.</u> at 1417-22. Surely, it cannot be suggested that Agent Kavanaugh's cold review of transcribed phone calls is remotely similar to the first-hand experiences and observations that the undercover agent in <u>Awan</u> was permitted to opine in his testimony. <u>See also</u> <u>United States v. Davis</u>, 787 F.2d 1501, 1505 (11th Cir. 1986) (upholding the admissibility of lay opinion testimony from two government witnesses about the double meaning of a conversation in which each witness was a personal participant).

Likewise in <u>United States v. Novaton</u>, we upheld the admission under Rule 701 of law enforcement agents' lay opinions that a reference to a "fifteen year old girl" actually referred to fifteen kilograms of cocaine. 271 F.3d 968, 1007 (11th Cir. 2001). We did so because the law enforcement officers conducted real-time video and foot surveillance of the several suspected drug conspirators, while

84

simultaneously listening to their conversations.  Id. at 980-81.  Thus, the witnesses

could confirm that no fifteen-year old girl was present.[6]

In a case with facts materially indistinguishable from those here, the Eighth

Circuit, too, recognized in United States v. Peoples that under Rule 701 a law

enforcement officer's testimony "is admissible as lay opinion only when the law

enforcement officer is a participant in the conversation, has personal knowledge of

the facts being related in the conversation, or observed the conversations as they

occurred."  250 F.3d 630, 641 (8th Cir. 2001) (emphasis added).  Like Agent

Kavanaugh, the agent in Peoples "did not personally observe the events and

activities discussed in the recordings, nor did she hear or observe the

conversations as they occurred."  Id. at 640.  Instead, the investigation upon which

she based her opinion consisted of listening to the recorded calls after the fact, just

as Agent Kavanaugh did here.  Id.  "[A]s the recordings of the [defendants']

conversations were played for the jury, [the agent] was allowed to offer a narrative

gloss that consisted almost entirely of her personal opinions of what the

---

[6]  The court in Novaton also noted the officers' years of experience in other drug-related investigations as another factor tending to support their lay opinion about the meaning of coded language.  271 F.3d at 1008-09.  However, the court explained in a footnote that, under the 2000 Amendment to Rule 701, it could well be that "the experiences which provided the testifying agents with a basis for rationally perceiving the information provided in their opinion testimony in this case would constitute 'specialized knowledge,' and that such testimony would now be admissible only under Rule 702."  271 F.3d at 1009 n.9.  The court in Novaton however, did not answer that question because the pre-amendment version of Rule 701 was applicable.

85

conversations meant." Id. Accordingly, the Peoples court held that the lead case agent's interpretation of the meaning of pre-recorded and transcribed telephone conversations already before the jury in written form was inadmissible under Rule 701. Id. The same is true of Agent Kavanaugh's testimony. See also United States v. Garcia, 413 F.3d 201, 212 (2d Cir. 2005) (recognizing that an agent who relies on all of the information gathered in an investigation to offer an opinion as to a person's culpable role in a charged crime "is not presenting the jury with the unique insights of an eyewitness's personal perceptions," and therefore, "the investigatory results reviewed by the agent—if admissible—can only be presented to the jury for it to reach its own conclusion").

The majority also erroneously relies on United States v. Gold, 743 F.2d 800 (11th Cir. 1984) and United States v. Hamaker, 455 F.3d 1316 (11th Cir. 2006) to conclude that Rule 701 permits a lay witness to offer opinion testimony based solely on his examination of documents that concern activities in which he did not personally participate.

Gold involved the permitted testimony of the president of a large eyewear company that the volume of eyewear sales at another large eyewear company was "excessive." 743 F.2d at 817. Gold, however, does nothing more than follow the long-standing practice in which "most courts have permitted the owner or officer

86

of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701, advisory committee's note (2000 Amendments) (emphasis added). The practice of courts in allowing business owners to testify under Rule 701, without undergoing the rigors of Rule 702, exists "because of the particularized knowledge that the witness has by virtue of his or her position in the business." Id. For us to extend this principle to law enforcement officers would require us to take into consideration an officer's years of experience in the "business" of law enforcement, which this Circuit has specifically held will run afoul of the limitation of Rule 701(c), see Dulcio, 441 F.3d at 1275, that requires the officer to qualify his testimony under Rule 702, see Garcia, 447 F.3d at 1335; Chastain,198 F.3d at 1349.

Hamaker is equally inapplicable and does not support the majority's contention that simply reviewing volumes of business records satisfies Rule 701(a)'s requirement that a lay witness's opinion testimony be "rationally based on [his] perception." The witness in Hamaker was an FBI financial analyst who testified about mathematical computations he performed using data from business records. 455 F.3d at 1330. The court in Hamaker explained that the witness "factually described [the defendant's] records and then matched a small subset of

the voluminous payroll, accounting, and invoice records." Id. at 1331 (emphasis added). The only question before the court in Hamaker was whether the witness's testimony was expert and should have been subject to Rule 702, which the court concluded it was not. Indeed the court in Hamaker summarily concluded that because the witness's testimony was not expert testimony, it therefore was allowed under Rule 701. It never engaged in any analysis of how a review of business records provides the witness with Rule 701(a)'s necessary first-hand knowledge or experiential observation.

Moreover, allowing a witness to testify about mathematical computations based in data actually in evidence is much different than allowing a witness to invade the jury's prerogative by choosing among various inferences that could be drawn from evidence and testifying that his inference is the correct one. Hamaker's permission of the application of mathematical computations to existing data does not provide an avenue through Rule 701 for a law enforcement officer to offer opinions or inferences about the hidden, coded, or double meaning of the contents of written documents in evidence based only on the evidence itself.

The majority also asserts that Cano is not applicable because Agent Kavanaugh based his opinions on what he learned during his investigation, which included some documents that were not in evidence, unlike the agent in Cano who

88

based his testimony only on facts in evidence. That position fails for two reasons. First, as I have already explained, it is impermissible under Rule 701 for a law enforcement officer to state that his lay opinion is based on "everything he learned in his investigation." Second, Agent Kavanaugh, just like the witness in Cano, purported to base his opinions on the facts already in evidence, namely the face of the transcripts of the defendants' many conversations, evidence that was available to the jury in exactly the same format as when Agent Kavanaugh reviewed it. Accordingly, not only is the defendants' reliance on Cano reasonable, but Cano's reasoning is directly applicable here.

Given our precedent, there is simply no support for the majority's conclusion that Agent Kavanaugh's opinions about the meaning of the defendants' conversations—which he asserts are based on everything he learned in an investigation that involved reading volumes of documents and conducting interviews—satisfies the first-hand knowledge and personal observation requirements of Rule 701.

Nor was Agent Kavanaugh's testimony "helpful" within the meaning of the requirements of Rule 701(b). Although testimony is certainly "helpful" when a witness simply agrees with the contentions of one side, that is not the meaning of "helpful" under Rule 701. Lay opinion testimony is not "helpful" for purposes of

89

admissibility under Rule 701 when it does nothing more than give one side's understanding of the evidence. See Fed. R. Evid. 701 advisory committee's note (1972 Proposed Rules) (explaining that "meaningless assertions which amount to little more than choosing up sides" are excludable under Rule 701 for lack of helpfulness).

We have concluded that a witness's testimony about the meaning of facts already before the jury is inadmissible lay opinion specifically because the testimony "merely delivered a jury argument from the witness stand." Cano, 289 F.3d at 1363. The detective's testimony in Cano "did precisely what the prosecutor invited the jury to do in closing argument; the jurors were asked to perform the same exercise [the detective] had carried out in their presence and break the code themselves." Id. at 1362. Here, Agent Kavanaugh's lay opinions were nothing more than the government's closing argument in disguise because the jurors were able to review the same transcripts of the pre-recorded telephone conversations and could draw their own conclusions about that evidence.[7] See also United States v. Frazier, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (en banc)

---

[7] The majority's contention that Agent Kavanaugh linked the defendants' calls to checks, wire transfers, and other discrete acts of material support is equally unavailing because, like the transcripts of the telephone calls, the checks, wire transfers, and other discrete acts were also in evidence. Thus, it was the jury's role to draw reasonable inferences from the evidence before it.

(explaining that, for purposes of admissibility under Rule 702, expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments"); United States v. Garcia-Ortiz, 528 F.3d 74, 80 (1st Cir. 2008) (concluding that a witness's opinion testimony "about a non-technical subject which was not beyond the purview of the jury" was inadmissible under Rule 701 because "[t]he jury was perfectly capable of drawing its own independent conclusion based on the evidence presented").

Accordingly, because Agent Kavanaugh's lay opinion testimony had no basis in any first-hand experiences or observations and merely delivered the government's position on how the jury should view the evidence before it, his opinion testimony about the meaning of the defendants' conversations was erroneously admitted under Rule 701.

II.     Padilla's Miranda Rights Were Violated at the Airport

Special Agent Russell Fincher testified to incriminating statements that Padilla made in the FBI interview while detained at O'Hare Airport in Chicago. Although there is no dispute that Padilla did not receive Miranda[8] warnings before making these incriminating statements, the majority concludes that no such

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

91

warnings were required because Padilla was not "in custody" at the time he made the statements. The record, however, cannot support this contention.

A defendant is "in custody" for <u>Miranda</u> purposes when there "is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (citation omitted). This test "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). Thus, "the only relevant inquiry is how a reasonable man in the [defendant's] position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984). In determining whether the defendant was in custody, we "examine all of the circumstances surrounding the interrogation." <u>J.D.B. v. North Carolina</u>, 564 U.S. __, __, 131 S. Ct. 2394, 2402 (2011) (citation omitted).[9]

---

[9] The majority relies on language in <u>United States v. Moya</u>, 74 F.3d 1117, 1120 (11th Cir. 1996), suggesting that a border interrogation must rise to a "distinctly accusatory" level before <u>Miranda</u> warnings must be given. <u>Moya</u>, however, involved only routine administrative questioning at the border by immigration officers for the purpose of determining the defendant's admissibility into the country. <u>Id.</u> at 1118-19. It therefore does not resemble the FBI's interrogation in this case, which was designed to obtain incriminating information. In any event, our precedent clarifies that whether the substance of a border interrogation was accusatory is only one factor to consider in the totality-of-the-circumstances analysis; <u>see United States v. McDowell</u>, 250 F.3d 1354, 1362-63 (11th Cir. 2001); and, as explained below, the FBI's interrogation in this case became accusatory well before Agent Fincher ceased eliciting incriminating statements subsequently introduced at trial.

The majority discounts or ignores several critical facts that, under controlling precedent, compel the conclusion that a reasonable person in Padilla's position would have felt a "restraint on freedom of movement of the degree associated with a formal arrest," Beheler, 463 U.S. at 1125 (citation omitted), and was, accordingly, "in custody."[10]

Upon his arrival at O'Hare from Pakistan, Padilla proceeded to the customs area for inspection, where he was removed from the general population and subjected to a secondary examination at the direction of the FBI. That secondary examination, which was conducted by a Customs Service inspector, typically involves a pat down, a luggage search, and an inquiry about currency or produce brought into the United States. During Padilla's examination, the inspector discovered that Padilla had declared on his customs form that he possessed $8,000 when he actually possessed a little more than $10,000. Because the failure to declare over $10,000 was a violation of the law, the inspector confiscated the money and retained Padilla's luggage. As a result, any attempt by Padilla to leave the airport following the secondary examination would have required him to

_____

[10] As noted by the magistrate judge in his report and recommendation, a comparison of the testimony given by the various law enforcement officers at the suppression hearing reveals several material discrepancies. I nonetheless describe the facts in the light most favorable to the government.

93

abandon both $10,000 and his luggage. Under our precedent, "[retaining luggage] itself is a sufficient restriction on one's freedom of action so as to trigger the giving of Miranda warnings before proceeding with any interrogation." United States v. McCain, 556 F.2d 253, 255 (5th Cir. 1977).[11]

Following the secondary examination, Padilla was brought to an airport conference room. Although Padilla was not physically restrained, precedent from both the Supreme Court and this Circuit establish that the fact that Padilla was escorted to the conference room—as opposed to going there on his own volition—weighs heavily in favor of finding that he was in custody. See Yarborough v. Alvarado, 541 U.S. 652, 665 (2004); Oregon v. Mathiason, 429 U.S. 492, 495 (1977); United States v. Hunerlach, 197 F.3d 1059, 1066 n.8 (11th Cir. 1999); United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir. 1987). Indeed, we have explicitly stated that "[a]n officer's asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave." United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986).

---

[11] While the district court made no finding regarding Padilla's luggage, the record nonetheless reflects that the government retained it following the secondary examination and this is but one of the many factors supporting the conclusion that Padilla was in custody.

Moreover, the conference room to which Padilla was escorted was located in a restricted part of the airport that was not accessible to the public. The Supreme Court has emphasized that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse." Berkemer, 468 U.S. at 438. We have similarly emphasized this point. See United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004) ("Instead of being detained in a remote area far from public scrutiny, [the defendant] was stopped in the parking lot of an apartment building in broad daylight. The officers' actions were visible to anyone in the area who chose to look."). Not only was the conference room located in a secure part of the airport, but it had no windows through which anyone could peer in. See United States v. Chavira, 614 F.3d 127, 135 (5th Cir. 2010) (emphasizing that "the questioning occurred in a windowless, secured area that was not accessible to the public"). And after Padilla was escorted inside the room, the door was closed behind him.

At that point, the government had successfully isolated Padilla in an unfamiliar environment, another critical fact in the custody analysis. See Beckwith v. United States, 425 U.S. 341, 346 n.7 (1976) ("[T]he principal

95

psychological factor contributing to successful [custodial] interrogation was isolating the suspect in unfamiliar surroundings for no purpose other than to subjugate the individual to the will of the examiner."); United States v. Brown, 441 F.3d 1330, 1348-49 (11th Cir. 2006) (emphasizing that the interview took place in a "familiar setting" where the defendant "often resided"); United States v. Manor, 936 F.2d 1238, 1241 (11th Cir. 1991) (emphasizing that the defendant "selected the location of the meeting and the conversation itself took place in the defendant's car").

Exacerbating Padilla's confinement in an unfamiliar environment, four armed FBI agents, not customs inspectors, immediately joined him inside the conference room. After closing the door behind them, the FBI agents identified themselves, presented their credentials, and announced their intention to interview Padilla. Four additional FBI agents waited outside. The presence of these FBI agents created precisely the "police-dominated atmosphere" that Miranda was designed to guard against. 384 U.S. at 445.

The totality of the circumstances described above, largely omitted from the majority's analysis, establish that Padilla was in custody before questioning even began. But if this conclusion was in doubt, the interview itself would eliminate any question that he was in custody. Agent Fincher began the interview by

informing Padilla that his failure to accurately declare the $10,000 was a violation of the law. Although Agent Fincher never told Padilla that he was under arrest, it is unrealistic to suggest that a reasonable person in Padilla's position would not experience a substantial restriction on his freedom of movement upon being informed by an FBI agent—in an enclosed and isolated room with several other FBI agents, separated from his luggage and $10,000—that he had just violated the law. Cf. United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (concluding that the defendant was not in custody in part because the officers "expressly stated at the outset that [the defendant] was not a suspect").

Moreover, despite informing Padilla of his legal violation, Agent Fincher did not ask Padilla a single question related to the currency over the next hour. Nor did Agent Fincher ask routine booking questions in order to ascertain basic biographical information. Rather, Agent Fincher proceeded to conduct a comprehensive background examination regarding Padilla's entire life history, from his time growing up in the United States to his time in the Middle East. Although Padilla was cooperative, this line of questioning had no bearing on his currency violation, and it would have therefore suggested to a reasonable person in Padilla's position that the FBI was looking for additional signs of illegal activity.

Indeed, Agent Fincher asked Padilla at the end of the first hour whether he had used any other names while traveling in the Middle East. Significantly, Padilla responded by asking to call his mother. Even more significantly, Agent Fincher did not allow Padilla to make this call, despite the fact that Padilla had his own cellular telephone and there was a telephone in the conference room. That Padilla even felt obligated to ask permission to make this call confirms that he was already in custody; that Agent Fincher failed to grant the request went so far as to render Padilla incommunicado. See Miranda, 384 U.S. at 457-58 ("The . . . practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself."); cf. Brown, 441 F.3d at 1349 (concluding that the defendant was not in custody in part because he was free to use the telephone and did so).

Following a break, Agent Fincher resumed the interview and increased the pressure. Agent Fincher reiterated that Padilla's currency discrepancy was a violation of the law, and he openly expressed skepticism regarding Padilla's statement that he did not believe that his failure to properly declare the $10,000 was "a big deal." Agent Fincher's increased pressure prompted Padilla to request permission to call his mother for the second time, a request that Agent Fincher again denied. Agent Fincher then "pressed" Padilla about the source and purpose

98

of the $10,000, an issue distinct from Padilla's failure to accurately declare the currency. And when Padilla failed to provide answers that Agent Fincher deemed adequate, Agent Fincher accused Padilla of not telling the truth.

When analyzed in conjunction with the circumstances preceding the interview, these facts compel the conclusion that Padilla was in custody absolutely no later than this point in time—over two hours after the interview began, but before the second break in the interview, before Agent Fincher accused Padilla of being a terrorist, and, most importantly, before Agent Fincher ceased eliciting the incriminating statements introduced at trial. Accordingly, on this record, I conclude that there was a Miranda violation in this case.

### III.     Padilla's Sentence is Substantively Reasonable

Because the majority usurps the authority of a trial judge to decide on a sentence that was "sufficient, but not greater than necessary," to achieve the statutory sentencing goals, see 18 U.S.C. § 3553(a), I also dissent from the majority's reversal of Padilla's sentence. In reversing Padilla's sentence, the majority fails to adhere to the principles articulated by the Supreme Court and this Circuit requiring appellate courts to accord the trial judge the "considerable discretion" granted district courts in sentencing and to guard against substituting its judgment for that of the trial judge. As this Court has explained:

The district court must evaluate all of the § 3553(a) factors when arriving at a sentence, but is permitted to attach great weight to one factor over others. In assessing the factors, the sentencing court should remember that each convicted person is an individual and every case is a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. When the district court decides after "serious consideration" that a variance is in order, it should explain why that variance is appropriate in a particular case with sufficient justifications. The justifications must be compelling enough to support the degree of the variance and complete enough to allow meaningful appellate review. But the Supreme Court has specifically rejected the idea that an extraordinary justification is required for a sentence outside the guidelines range.

Because of its institutional advantage in making sentence determinations, a district court has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate. We must give its decision due deference. We may vacate a sentence because of the variance only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case. However, that we might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal.

United States v. Shaw, 560 F.3d 1230, 1237-38 (11th Cir. 2009) (emphasis added) (internal citations and quotation marks omitted).

The majority, however, concludes that Padilla's sentence is substantively unreasonable because it "does not adequately reflect his criminal history, does not adequately account for his risk of recidivism, was based partly on an impermissible comparison of sentences imposed in other terrorism cases, and was

100

based in part on inappropriate factors." As demonstrated below, there is no support in this record for the majority's stated reasons and thus no support for its conclusion that the trial judge abused its discretion by imposing a below-Guidelines sentence of seventeen and one-half years' imprisonment.

A.    Criminal History

The majority first suggests, in citing 28 U.S.C. § 994(h), that the trial judge improperly discounted Padilla's criminal history because his sentence was not at or near the top end of his Guidelines range. This record, however, categorically refutes any possible conclusion that the trial judge failed to consider Padilla's criminal history. The sentencing hearing in this case spanned nine days during which the trial judge heard testimony of several witnesses and considered numerous boxes of documentary evidence and lengthy arguments from counsel. At the conclusion of the evidence, the trial judge explicitly stated that: "Mr. Padilla is the only defendant in this matter with a prior criminal record. He has both a juvenile and adult record. His last conviction occurred just prior to the beginning of the conspiracy." And later, just prior to rendering Padilla's sentence, the trial judge again stated: "As to Defendant Padilla, unlike the other two defendants, he has a significant criminal record," and proceeded to sentence Padilla to a longer term of imprisonment than his two co-defendants.

101

The majority's contention that the <u>only</u> appropriate sentence for Padilla is one at or near the high end of the Guidelines range also defies logic. Such a contention violates <u>United States v. Booker</u>, 543 U.S. 220 (2005), and its progeny by inappropriately treating the Guidelines as mandatory. Indeed, if the trial judge had treated the Guidelines as mandatory, we would be required to reverse the sentence as procedurally erroneous. <u>See</u> <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007) (explaining that the appellate court must ensure that the district court committed no significant procedural error such as treating the Guidelines as mandatory). Moreover, such a contention completely ignores Congress' mandate to consider, not only criminal history, but <u>all</u> of the history and characteristics of the defendant, as well as the other § 3553(a) factors, before imposing sentence. <u>See</u> 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

B.    <u>Pre-Trial Confinement</u>

Here, the trial judge appropriately took pains to consider all of the requisite § 3553(a) sentencing factors, not just Padilla's criminal history, when deciding on a reasonable sentence that was "sufficient, but not greater than necessary," to

achieve the statutory sentencing goals. See 18 U.S.C. § 3553(a). Among other things, the trial judge correctly concluded that a sentence reduction is available to offenders who have been subjected to extraordinarily harsh conditions of pre-trial confinement. See United States v. Pressley, 345 F.3d 1205, 1218-19 (11th Cir. 2005). Padilla presented substantial, detailed, and compelling evidence about the inhumane, cruel, and physically, emotionally, and mentally painful conditions in which he had already been detained for a period of almost four years. For example, he presented evidence at sentencing of being kept in extreme isolation at the military brig in South Carolina where he was subjected to cruel interrogations, prolonged physical and mental pain, extreme environmental stresses, noise and temperature variations, and deprivation of sensory stimuli and sleep. In sentencing Padilla, the trial judge accepted the facts of his confinement that had been presented both during the trial and at sentencing, which also included evidence about the impact on one's mental health of prolonged isolation and solitary confinement, all of which were properly taken into account in deciding how much more confinement should be imposed. None of these factual findings, nor the trial judge's consideration of them in fashioning Padilla's sentence, are challenged on appeal by the government or the majority. Indeed, the majority accepts that our decision in Pressley allows for a sentence reduction to account for

the conditions of defendant's pre-trial confinement, but then asserts that Pressley does not permit a reduction as "extensive" as the one given here.  Contrary to the majority's suggestion, that case did not create a cap on how great a reduction can be in any specific case.  Rather, Pressley reaffirms the trial judge's discretion to consider the unique facts of a defendant's pre-trial confinement when deciding what weight to give and how to account for those conditions in ultimately imposing the sentence.  345 F.3d at 1219.  See also Shaw, 560 F.3d at 1237-38 (explaining that the district court "is permitted to attach great weight to one factor over others" and "has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate").

The majority fails to identify any clear error in the trial judge's decision to vary downward, and instead arbitrarily concludes that the variance was just too much.  In blatantly substituting its own view for the discretion of the trial judge, the majority contravenes the well-established principle that "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."  Gall, 552 U.S. at 51.  This principle exists because "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.  The judge sees and hears the evidence, makes credibility determinations, has full

104

knowledge of the facts and gains insights not conveyed by the record." Id. (emphasis added) (internal quotation marks omitted). Thus, by declaring, without explanation, that the downward variance the trial judge applied in this case due to the harsh conditions of Padilla's pre-trial confinement was too "extensive," the majority impermissibly usurps the discretion of the sentencing judge in direct contravention of clear and unequivocal Supreme Court and Circuit precedent.

C.      Future Dangerousness

The majority also concludes that the trial judge erred in determining that Padilla will not pose a high risk of recidivism upon his release from prison when he is in his mid-fifties, and even though he will be subject to a twenty-year term of supervised release. While the majority recognizes that a trial judge may find that recidivism generally decreases with age,[12] it not only rejects that presumption for Padilla, but goes one step further and decides that trial judges may no longer consider, for anyone convicted of a terrorism-related offense, the likelihood that the risk of recidivism will decrease with age. The majority does so, even in the absence of any evidence supporting that conclusion, and even though the government does not challenge on appeal as clearly erroneous the trial judge's

_____

[12] See e.g, United States v. Cavera, 550 F.3d 180, 219 n.4 (2d Cir. 2008) (Sotomayor, J., concurring and dissenting in part) (citing a 2004 recidivism study of the United States Sentencing Commission for the proposition that there is an inverse relationship between age and recidivism).

105

fact-finding that Padilla would be unlikely to engage in new criminal activity when released from prison.[13]  See United States v. Irey, 612 F.3d 1160, 1216 (11th Cir. 2010) (en banc) (accepting the district court's finding that the defendant posed a low risk of recidivism upon release because the government never challenged this fact-finding as clearly erroneous).

The majority concludes that because we rejected the presumption that recidivism decreases with age for sex offenders in Irey, we can do the same for those convicted of terrorism-related crimes.  The majority's reliance on Irey for this contention is misplaced for two reasons.  First, although the majority in Irey provided numerous reasons why it would, if it could, reject such a presumption for sex offenders, its discussion on this point was merely dicta and admittedly advisory.  Irey, 612 F.3d at 1216 n.35 ("Although we have pointed out for the benefit of sentencing courts in the future the reasons and decisions indicating that the district court's finding is wrong, because the government has not challenged the factfinding we have expressly accepted the low risk of recidivism finding for

---

[13] The government makes only a passing and conclusory reference to recidivism on the last page of its brief without specifically addressing the sentencing court's fact-finding.  The totality of the government's argument regarding recidivism is the following: "[The risk of recidivism upon release is very real.  That risk is greater because Padilla has literally learned to kill like a terrorist."  Even if this brief statement is construed as a challenge to the trial judge's fact-finding that Padilla is not likely to commit future crimes when released from prison in his mid-fifties, the government's argument fails to explain why Padilla should be presumed dangerous after serving a seventeen and one-half years' sentence and remaining subject to an additional twenty years of supervised release.

purposes of reviewing this sentence."). Contrary to the majority's assertion here, Irey did not establish that it is erroneous to find that recidivism decreases with age for sex offenders, because that question was not at issue.

Second, in Irey, the Court went to great lengths to identify numerous decisions and empirical studies to support its belief that the district court clearly erred in concluding that the defendant in that case, a sexual predator, posed a low risk of recidivism. See id. at 1213-16. Here, other than the majority's conclusory statement that "Padilla poses a heightened risk of future dangerousness due to his al-Qaeda training," the majority fails to point to any evidence in the record supporting its rejection of the trial judge's finding that Padilla is not likely to commit future crimes after twenty years in prison.[14] Rather, the majority simply posits that Padilla will continue to present a special risk of dangerousness because terrorists are "far more sophisticated" than ordinary street criminals. But even if we accept the assertion that terrorism-related crimes are more sophisticated than ordinary crimes, the majority fails to explain, and there is no evidence in this

---

[14] Even though the majority points to the fact of Padilla's al-Qaeda training, there is nothing in this record to show how his training correlates to his future dangerousness sufficient to render the trial judge's fact-finding regarding Padilla's risk of recidivism after his term of imprisonment clearly erroneous.

record to show, how the complexity of one's crime either correlates to or increases one's future dangerousness.

The one case the majority cites for support only belies its conclusion. In United States v. Meskini, the Second Circuit concluded that Congress had a rational basis to boost the criminal history category to VI for first time terrorism offenders based on the "likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." 319 F.3d 88, 92 (2d Cir. 2003). The court in Meskini did not establish a rule that, as a category of offenders, those convicted of terrorism-related offenses will never be able to show that they do not pose a danger to the public due to their advanced age for purposes of evaluating specific deterrence under § 3553(a). To the contrary, the Meskini Court noted that in individual cases, a sentencing court always has the discretion to depart downward when it determines that the criminal history category of VI over-represents the likelihood that an individual defendant charged with a crime of terrorism will commit other crimes in the future. Id. That is what the trial judge did in Padilla's case and the majority has no principled basis to reject out of hand the fact-finding that Padilla is not likely to commit future crimes when he is released from prison.

D. Unwarranted Disparity Among Similarly Situated Defendants

The majority also unnecessarily "admonishes" the trial judge to avoid re-sentencing Padilla in a manner inconsistent with similarly situated defendants. Despite the majority's concern that the trial judge failed to consider the differences between Padilla and other offenders charged with acts of terrorism, the record reflects that the trial judge referenced the other terrorism cases to ensure that Padilla be sentenced consistently with any similarly situated defendants. For example, even though Padilla identified and the trial judge noted other offenders who had received shorter sentences for  providing material support to terrorists, such as David Hicks (nine months) and Yahya Goba (ten years), the trial judge sentenced Padilla more harshly than those two defendants had been precisely because they were <u>not</u> similarly situated to Padilla.  Padilla <u>was</u> sentenced significantly more harshly than those defendants who pled guilty, were convicted of less serious offenses, or who lacked extensive criminal histories, and yet less severely than those convicted of more serious crimes.  A trial judge is not precluded from identifying and commenting upon the sentences of other offenders who were charged with less serious crimes, pled guilty, or had less of a criminal history.  Indeed that is exactly what the trial judge should do to accommodate as best as possible "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct."

18 U.S.C. § 3553(a)(6).

The sentences imposed on all three defendants in this case properly reflect this principle. All three defendants were charged with and convicted of the same three offenses. All three had a guidelines range of 360 months to life, from which the trial judge departed downward and imposed a unique sentence on each defendant. The government raises no concerns that Hassoun and Jayyousi received downward departures, even though they both were credited with criminal histories at a level four. As their criminal history scores were two levels below Padilla's, they both accordingly received lower sentences than Padilla. That Padilla's sentence was not significantly greater than Hassoun's most likely resulted from weighing of all other § 3553(a) factors, in particular the unique and extremely harsh conditions of Padilla's pre-trial confinement.

E.     Absence of Personal Harm or Targeting of the United States

Finally, the majority faults the trial judge for remarking that the defendants' crimes did not personally harm anyone nor target the United States. It is a complete misreading of the record to suggest that the trial judge reduced Padilla's sentence on this basis. The trial judge's comments were made as general remarks applicable to each of the defendants, and were never given as a reason to depart

110

downward.  Rather, in rejecting the defendants' contention that they had been overcharged, the trial judge noted that the defendants' "behavior is a crime," and characterized the crimes as "very serious."  Finally, just prior to announcing the terms of imprisonment for each defendant, the trial judge reiterated that "[t]he sentences that I announce today do reflect the seriousness of the offense and each defendants' culpability in criminal conduct.  I have already discussed the seriousness of the offenses and each defendants' culpability."  The trial judge further explained that the sentences will serve to inform others that conspiracy to murder, maim, and kidnap abroad will not be tolerated in this country and the fact that the activities were directed overseas does not excuse them and indeed warrants incarceration.  Given the trial judge's numerous references to the seriousness of the crimes in this case, it can hardly be reversible error also to recognize what the crimes did not entail.

Much of what the majority takes issue with concerns the trial judge's discretion in weighing the § 3553(a) factors, but the record simply cannot support the conclusion that Padilla's sentence involves an abuse of such discretion. Precedent from the Supreme Court and this Circuit recognize that trial judges may "attach great weight to one factor over others," and "remember that each convicted person is an individual and every case is a unique study in the human failings that

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Shaw, 560 F.3d at 1237-38 (citations and alterations omitted). The trial judge followed these principles such that her conclusion to sentence Padilla below the Guidelines is entitled to "due deference," even by those who "might reasonably have concluded that a different sentence was appropriate." Id. at 1238 (citations omitted).

IV. Conclusion

The old adage that "hard facts make bad law" is clearly evident here. First Agent Kavanaugh's opinion testimony should have been excluded because he was never qualified as an expert and did not have the requisite first-hand knowledge to offer his lay opinion. His lay opinion testimony was merely the government's closing argument in disguise. Second, the incriminating statements Padilla made prior to being read his Miranda rights should have been suppressed, because, under the undisputed facts in this record, it is beyond peradventure that Padilla was in custody at the time he made them. Finally, the sentence imposed on Padilla should not be disturbed by this Court, because doing so simply substitutes this Court's sentencing judgment for that of the trial judge, in whom that authority inheres.